NEW YORK CREDIT MEN'S ADJUST-
MENT BUREAU, INC., as Trustee in
Bankruptcy of the Estate of Talmadge
Hill, Ltd., Bankrupt, Plaintiff,

v.

Ira ADLER, Phyllis Adler and Harve
Edwards, Defendants.

Bankruptcy No. 78 Civ. 5635.

United States District Court,
S. D. New York.

Jan. 30, 1980.

Hahn, Hessen, Margolis & Ryan, New York City, for plaintiff; William R. Fabrizio, New York City, of counsel.

Fine, Tofel, Saxl & Berelson, New York City, for defendants Ira Adler and Phyllis Adler; Joel A. Reiss, New York City, of counsel.

OPINION

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

The trustee in bankruptcy of the Estate of Talmadge Hill Ltd. ("Talmadge") seeks to recover money alleged to have been fraudulently obtained from Talmadge by Harve Edwards, Ira Adler and Adler's wife,

Phyllis. Edwards, the Chief Executive Officer and President of Talmadge defaulted. Judgment was entered against him in the amount of $112,383.76 and the case against the Adlers proceeded to trial.

The principal witness on behalf of the trustee was Edwards who testified as to false entries on the books of Talmadge, the issuance of false invoices which were factored with a bank, and other fraudulent conduct. His testimony was sharply contradicted by Adler. Thus the determination of the issues as to which the plaintiff has the burden of proof turns in large measure upon the verity of these witnesses. Based upon a word-by-word reading and study of the entire record, the Court's contemporaneous trial notes which include an appraisal of the credibility of witnesses and their demeanor, the reasonable inferences drawn from undisputed and clearly established facts and upon the totality of the testimonial and documentary evidence, the Court concludes that plaintiff has sustained its burden of proof—in short, the Court finds that Edwards told a substantially truthful story as to matters touching upon and related to transfers and that Adler's testimony was deliberately false. A bookkeeper, who Adler testified would not lie, corroborated Edwards' testimony that Adler was the mastermind who contrived the issuance of fictitious invoices. Adler himself admitted that he originated certain false entries in order to conceal from Talmadge's union the fact that goods were being manufactured in southern factories at cheaper labor costs.

Edwards, at the time of the events in question, was the President and sole stockholder of Talmadge. Because Talmadge was already experiencing financial difficulties in the latter part of 1976 he invited the assistance of Adler, an accountant who had been recommended to him. Adler, by the end of 1976, became Talmadge's financial adviser on a full-time basis. He thereupon assumed full control over the books and records of the company, of its relations with creditors, and its billing procedures; he fully supervised and directed the financial affairs of the company. For these services he received no salary. However, he testified that he had an understanding with Edwards that if Talmadge's financial picture improved he would be given a share of the enterprise, as he described it, "a piece of the action." Adler's wife also reported to Talmadge's office though on a less regular basis.

Upon assuming his duties and in the latter part of 1976, Adler conducted a thorough review of Talmadge's accounts and found that the company was already $25,000 "in the red"—that at this point the total outstanding liabilities of the company exceeded the value of the assets if liquidated by that amount. Despite this knowledge, he initiated a series of transactions within a period of 9 weeks between January 3 and March 11, 1977 that resulted in the diversion of thousands of dollars of corporate funds to the personal use of the Adlers and Edwards and that culminated in the company's demise a month later in April 1977.

Shortly after Adler entered into the life of Talmadge and within a period of less than a month between the 3rd and 31st of January, 1977, a total of $89,000 was withdrawn from Talmadge for non-business purposes and without supporting vouchers. On January 3, 1977, Talmadge issued four checks each in the sum of $2,500 for a total of $10,000; they were payable to and endorsed by Phyllis Adler and deposited in her account. On January 19, 1977 Talmadge issued another check to Phyllis Adler in the sum of $5,000 which was endorsed by her and deposited in her account.

Before the end of the month, the largest withdrawals occurred, totaling $74,000; this money was used to purchase a 50% stock interest in Avante, a company which manufactured women's sportswear and which, soon after this transaction, filed an involuntary petition in bankruptcy. Although both Edwards and Ira Adler testified that the purchase was made "on behalf of Talmadge Hill," the overwhelming weight of the evidence indicates that the use of the corporate funds was for the individual benefit of the two stockholders. The written agree-

ment of purchase and sale lists Edwards and Adler as the purchasers; it makes no reference to Talmadge Hill. The Avante shareholders testified that the sale was to Edwards and Adler as individuals and there was never any discussion of Talmadge acquiring an interest in Avante or any plans or mention of any merger of the two companies.

Other circumstances surrounding the withdrawal of the funds establish that it was not a corporate purchase nor for the corporation's benefit. The purchase was financed by two checks issued by Talmadge; each was payable to Ira Adler; one was in the sum of $39,000 dated January 28, 1977 and the other in the sum of $35,000 dated January 31, 1977. The checks were endorsed by both Ira and Phyllis Adler and deposited in Phyllis Adler's personal account. In turn, Ira Adler used his personal checks for the purchase of his and Edwards' interest in Avante. The reason for the separate issuance of the two checks, one in the sum of $39,000 on January 28 and the other on January 31 in the sum of $35,000, three days apart, is not without significance as to Talmadge's financial condition. On January 28 when the first check was issued, Talmadge had insufficient funds on hand or other resources to cover the total purchase price of the shares.

There were still other withdrawals. On March 1, 1977, Talmadge issued a check to J. Elliot Scott in the sum of $5,221.80 which was deposited in an account maintained by J. Elliot Scott Inc. (a company owned or controlled by the Adlers). This was followed on March 11 by another check issued payable to cash in the sum of $4,500 and deposited in Phyllis Adler's account.

During the entire period from January 3, 1977 to March 11, 1977 when the aforesaid funds were withdrawn, Talmadge was in dire financial straits; it was behind in payment of its current obligations; its bank account at times was overdrawn and at other times checks were withdrawn in favor of creditors' obligations and were not mailed because there were not sufficient funds on hand to meet the drawn checks.

The explanations offered by Adler as to the reasons for the withdrawal of these vast sums and their deposit in his wife's account are as varied as they are false. The principal claim that these were repayments of loans or monies advanced by them for expenses on behalf of Talmadge or for services rendered to it is belied by substantial evidence.

Edwards testified that sometime in January 1977 Adler suggested that Talmadge could raise money to meet its requirements by issuing fraudulent invoices and assigning the resulting accounts receivable to the company's factor, Bankers Trust Company, and thereby securing substantial advances against them. Both Edwards and Talmadge's bookkeeper, Eva Botnick, testified that Ira Adler had initiated and directed the issuance of the fraudulent invoices. The scope of the fraudulent scheme is evident when it is noted that between January 11 and April 12, 1977 Talmadge created and assigned to Bankers Trust Company fictitious invoices with a face value of more than $400,000. Edwards testified that the funds used to purchase his and Adler's shares of Avante were themselves generated through the issuance of fictitious invoices, testimony which was verified by records kept at the Bankers Trust Company. Further, Edwards testified that one of the reasons that he and Adler purchased an interest in Avante was to facilitate a close exchange of such invoices and thereby delude for as long as possible the two companies' respective factors. The documentary evidence—including the checks issued to Ira Adler and Phyllis Adler, the purchase of Avante, the fraudulent invoices assigned to Bankers Trust, the falsified ledger books and the absence of a single entry on the books of Talmadge showing that any advances or loans were made or expenses incurred on behalf of Talmadge—all substantially corroborate Edwards' testimony. Moreover, the Court finds that Adler induced Edwards to sign a false affidavit purporting to exonerate Adler of his participation in the wrongful conduct in the affairs of Talmadge—an act which permits an

inference of consciousness of guilt.[1] Indeed, Edwards' self-characterization as a "puppet" in explaining his yielding to Adler's directions is fully justified by the record.

In further support of its claim the trustee presented the testimony of Bernard Augen an expert accountant with considerable experience in bankruptcy accounting. Despite the myriad of problems encountered—including the lack of books and records, of physical inventory, and of any certified financial statements prepared by the previous accountant—he was able to reconstruct an accurate picture of Talmadge's financial situation in the months prior to its collapse. He testified that at all times between December 31, 1976 and March 11, 1977, the period within which the transfer of funds from Talmadge was effected, Talmadge's liabilities exceeded its assets by no less than $150,000, and at times by more than $300,000. Moreover, he rebutted the hearsay assertions contained in an unaudited report, prepared by an accountant hired at the recommendation of Adler and supplied with raw data by Adler, that purportedly showed Talmadge to be solvent at the end of 1976. The report itself, although repeatedly alluded to by the defendants, was not offered into evidence; its author was not called to the stand. The only testimony offered in opposition to Augen's thorough and credible depiction of Talmadge's financial plight was that of the defendant Ira Adler. His testimony in this instance was as unreliable as it was when in conflict with the testimony of witnesses called by the plaintiff on other issues.

Section 67d(2)(a) of the Bankruptcy Act[2] deems fraudulent all conveyances made within one year of the filing of a petition in bankruptcy, whenever one of the following criteria is met: (a) if the transfer is made without fair consideration by a debtor who is thereby rendered insolvent; (b) if made without fair consideration, and with the result that the property left in the hands of the debtor is unreasonably small capital for the ongoing enterprise; (c) if made without fair consideration, by a debtor who intends to incur or believes he will incur debts beyond his ability to pay as they mature; or (d) if made with intent, actual or presumed, to hinder, delay, or defraud either existing or future creditors.

■ The trustee's claim that each of the transfers, for a total value of $98,721.80, was fraudulent under each of the four theories enumerated in the Act, has been fully sustained. Preliminarily, it is noted that all of the transfers at issue occurred during the one-year period preceding the filing of Talmadge's petition in bankruptcy.[3] Furthermore, on the date of the first transfer, and at all times thereafter, there were creditors of Talmadge in existence.

■ There cannot be any question that these transfers were made without fair consideration. As Judge Lumbard has said in the leading case, " 'Fair consideration' requires both a fair equivalent and good

1. *United States v. Parness*, 503 F.2d 430, 438 (2d Cir.), *cert. denied*, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1974); *United States v. Lacey*, 459 F.2d 86, 89 (2d Cir.), *cert. denied*, 409 U.S. 860, 93 S.Ct. 146, 34 L.Ed.2d 106 (1972). *Cf. United States v. Gottfried*, 165 F.2d 360, 363 (2d Cir.) (Hand, J.), *cert. denied*, 333 U.S. 860, 68 S.Ct. 738, 92 L.Ed. 1139 (1948) ("[I]t is the universal rule that attempts to suppress evidence of a crime are competent evidence of guilt.")

2. 11 U.S.C. § 107(d)(2)(a)–(d). [All references to the Act refer to its provisions prior to the amendments of October 1, 1979.] *See Cohen v. Sutherland*, 257 F.2d 737, 741–42 (2d Cir. 1958); *In re Freudmann v. Blankstein*, 495 F.2d 816 (2d Cir.), *cert. denied*, 419 U.S. 841, 95 S.Ct. 72, 42 L.Ed.2d 69 (1974); *Klein v. Ta-*

*batchnick*, 418 F.Supp. 1368, 1371 (S.D.N.Y. 1976), *rev'd on other grounds*, 610 F.2d 1043 (2d Cir. 1979).

New York law contains parallel provisions. *See* New York Debtor and Creditor Law §§ 271, 273–76 (McKinney's 1945). The elements of a claim of fraudulent conveyance under New York law are discussed in *McNellis v. Raymond*, 287 F.Supp. 232, 236–38 (N.D.N.Y. 1968), *rev'd on other grounds*, 420 F.2d 51 (2d Cir. 1970).

3. The first of these payments was made on January 3, 1977; the last, on March 11, 1977. Talmadge filed an involuntary petition in bankruptcy on August 11, 1977, and was adjudicated a bankrupt on September 1, 1977.

faith."[4]  Here both were absent.  With respect to all nine of the checks at issue here, the evidence leaves no room to doubt that Talmadge received no consideration whatsoever.

Additionally, there cannot be any doubt about Talmadge's depressed financial condition at the time of the transfers.  Competent and credible testimony was offered by Mr. Augen, the trustee's expert and a certified public accountant.  Through a technique called "retrojection"[5] he reconstructed, from the company's incomplete and falsified records, a reasonably accurate picture of Talmadge's condition from the end of 1976 to April 1977.  He concluded that at all times within that period the salable value of Talmadge's property was less than the amount required to pay its debts; thus, the company was insolvent.[6]

It necessarily follows that the company was left with unreasonably small capital with which to operate.  Apart from the expert testimony offered to bolster this point, an officer from Bankers Trust testified that Talmadge's low capital created a "risk" from January 1977 onward.  More generally, the bookkeeper Botnick testified that from October 1976 onward Talmadge was constantly behind in paying its bills.  Ira Adler confirmed this fact.  He admitted that up until the end Talmadge was always "past due" in paying its bills; at times it was behind by as much as $100,000.  Thus, there was ample evidence from which the Court concludes that in 1977 up to its demise Talmadge was forced to operate with unreasonably small capital.

Moreover, the transfers were made at a time when Talmadge intended to incur or believed that it would incur debts beyond its ability to pay.  Edwards and Adler embarked on their scheme of issuing fictitious invoices at least as early as January 11, 1977, when the first such invoice was issued; thus, it is clear that at least from that time onward, Talmadge intended to incur debts it could not pay.  Even were we to assume that Talmadge had not formed the requisite intent prior to January 11, the four transfers made on January 3 (for a total of $10,000) would nevertheless be fraudulent under this theory, in that there was ample testimony that at the time they were made Talmadge was already unable to meet its obligations, and that Adler's policy as financial adviser was to appease creditors, rather than to pay them.

■ Finally, the Court finds that Ira Adler had the actual intent to hinder, delay or defraud either existing or future creditors.  On this issue the requisite intent may be established inferentially, by circumstantial proof.[7]  The fictitious invoices, the fur-

4. *Cohen v. Sutherland*, 257 F.2d 737, 742 (2d Cir. 1958) (citation omitted).  *See Bullard v. Aluminum Company of America*, 468 F.2d 11, 13 (7th Cir. 1972); *Inland Security Co. v. Estate of Kirshner*, 382 F.Supp. 338, 346–48 (W.D.Mo. 1974); *Duberstein v. Werner*, 256 F.Supp. 515, 520 (E.D.N.Y.1966).  This dual requirement is specifically incorporated into the Act.  11 U.S.C. § 107(d)(1)(e).

5. The technique has been often employed and often approved.  Indeed, it provides the only reliable means of determining solvency when the basic data normally available, such as books and inventory, are incomplete or missing.  *See Haynes & Hubbard, Inc. v. Stewart*, 387 F.2d 906, 907 n.1 (5th Cir. 1967); *Hassan v. Middlesex County Nat'l Bank*, 333 F.2d 838, 839–41 (1st Cir.), *cert. denied*, 379 U.S. 932, 85 S.Ct. 332, 13 L.Ed.2d 344 (1964); *Seligson v. New York Produce Exchange*, 394 F.Supp. 125, 131 (S.D.N.Y.1975); *Inland Security Co. v. Estate of Kirshner*, 382 F.Supp. 338, 345 (W.D. Mo.1974).

6. Under the Act, "a person is 'insolvent' when the present fair salable value of his property is less than the amount required to pay his debts."  11 U.S.C. § 107(d)(1)(d).  *See also* New York Debtor and Creditor Law § 271(1) ("a person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.")

7. *See Lesser v. Jewel Factors Corp.*, 470 F.2d 108, 110 (2d Cir. 1972), *aff'g, Lesser v. Mendelson*, 352 F.Supp. 321 (S.D.N.Y.1971); *In re Freudmann*, 362 F.Supp. 429, 432 (S.D.N.Y.1973), *aff'd sub nom. Freudmann v. Blankstein*, 495 F.2d 816 (2d Cir.), *cert. denied*, 419 U.S. 841, 95 S.Ct. 72, 42 L.Ed.2d 69 (1974); *Duberstein v. Werner*, 256 F.Supp. 515, 520 (E.D.N.Y.1966).  *See also* 4 *Collier on Bankruptcy* ¶ 548.02[5], at 548–32, 548–33 (15th ed. 1979).

tive purchase of and partnership in Avante, the absence of consideration for the transfers, and the falsified entries in the journals, as well as the other evidence, all support the inference that at the time of the transfers, Adler possessed both the requisite control over the company and the requisite intent to defraud. The Court so holds.

As to Phyllis Adler, the claim based upon her husband's contention that she was innocent of all knowledge of the actions and events relating to the withdrawals and that she played no role with respect thereto is contrary to the great weight of the evidence. The circumstantial evidence warrants a finding that she was a knowing participant in the abstraction of the funds from the corporation and aided and abetted her husband in carrying out his illicit purpose in the withdrawals. The use of her bank account as a conduit for the checks is probative as is her endorsement upon them. Her occasional appearance at the offices of Talmadge and her relationship to its financial adviser support an inference that she was aware of and knowingly acquiesced in the transactions. Moreover, with respect to the withdrawal in the sum of $5,221.80 through a check payable to J. Elliot Scott and deposited in a J. Elliot Scott Inc. bank account, although she did not testify at the trial, she was examined on this subject before trial. Her testimony that the check was in payment for services rendered to Talmadge in the refurbishing of its offices was not only contradicted by credible testimony of Talmadge employees that no such services were performed but is in contradiction with her own husband's testimony on this subject. Finally, although she was present at the trial she failed to testify which permits an adverse inference.[8] In substance the evidence supports a finding

that Phyllis Adler by her actions and conduct intended to hinder, delay or defraud the existing and future creditors of Talmadge.

The foregoing shall constitute the Court's findings of fact and conclusions of law.

Judgment may be entered accordingly.

---

**8.** *N. Sims Organ & Co. v. Securities and Exchange Comm'n*, 293 F.2d 78, 80–81 (2d Cir. 1961), *cert. denied*, 368 U.S. 968, 82 S.Ct. 440, 7 L.Ed.2d 396 (1962); *Securities and Exchange Comm'n v. Kelly Andrews & Bradley, Inc.*, 341 F.Supp. 1201, 1205 & n.5 (S.D.N.Y.1972) (citing cases).

Similarly, a party's failure to call an available witness permits an inference that the witness' testimony would have been unfavorable. This

is particularly true where the uncalled witness' relationship to the party would be likely to produce a favorable bias toward him. *See United States v. Peltz*, 433 F.2d 48, 53 n.6 (2d Cir. 1970), *cert. denied*, 401 U.S. 955, 91 S.Ct. 974, 28 L.Ed.2d 238 (1971). *See also United States v. Leonard*, 524 F.2d 1076, 1083–84 (2d Cir. 1975), *cert. denied*, 425 U.S. 958, 96 S.Ct. 1737, 48 L.Ed.2d 202 (1976); *United States v. Evanchik*, 413 F.2d 950, 953–54 (2d Cir. 1969).