### In re CAROUSEL CANDY CO., INC., Debtor.

### James BARR, Trustee of Carousel Candy Co., Inc., Plaintiff,

### v.

### William E. WEBER, Douglas Bates, and Charles Bertonazzi, Defendants.

#### Bankruptcy No. 880–00672–20.
#### Adv. No. 881–0512–20.

United States Bankruptcy Court, E.D. New York.

April 11, 1984.

---

William Weber, pro se.

Charles Bertonazzi, pro se.

Miriam P. Null, Great Neck, N.Y., for trustee.

## DECISION

**ROBERT JOHN HALL,** Bankruptcy Judge.

On July 14, 1981, the Trustee for Carousel Candy Co., Inc., instituted two adversary proceedings which were consolidated by Order dated May 3, 1982. The consolidated adversary proceeding essentially involved two causes of action. The Trustee sought an order directing the turnover of property of the debtor's estate which was allegedly transferred by the defendants. For one set of transfers, the Trustee based her request for relief upon section 548(a)(2) of the Bankruptcy Code. 11 U.S.C. § 548(a)(2) (Supp. IV 1980). For a second set of transfers, the Trustee sought relief under section 549 of the Code.

For the most part, trial on these matters took place on the 13th, 14th, and 15th days of September, 1982. On August 31, 1983, the defendant Saul Hershey was severed and withdrawn as a party defendant due to his filing of a petition in bankruptcy in Florida. The Order severing Hershey also directed the remaining defendants and the plaintiff to submit proposed findings of fact and conclusions of law, and scheduled closing arguments. The plaintiff, and defendant Weber complied with the Order, but defendant Bertonazzi did not. The adversary proceeding was settled between the plaintiff and defendant Bates. Oral argument by the plaintiff and defendant Weber was heard on February 15, 1984.

 Upon consideration of the testimony given, the exhibits admitted into evidence, the demeanor of the witnesses, and the proposed findings of fact and conclusions of law submitted by both the plaintiff and defendant Weber, the Court finds that the relief requested by the plaintiff should be granted in all respects. Furthermore, the Court adopts the proposed findings of fact and conclusions of law submitted by the Trustee,[1] subject to the following minor modification.

With regard to the sale of the peanut roaster, the Trustee asserted that because the debtor was in fact substantially benefited by the satisfaction of its loan with the bank, the Court should award Weber a fee for his services performed in selling the roaster. The Trustee acknowledged that the $6,000 fee retained by Weber was grossly excessive in light of the services rendered and Weber's divided loyalties, but felt that the fee should be lessened but not eliminated. The Trustee's focus upon the services rendered by Weber is much too narrow. Although in a sense Weber did render services to the debtor when he sold the machine, in a broader sense Weber harmed the debtor in his conduct surrounding distribution of the proceeds of the sale, as well as his conduct surrounding his entire involvement with this debtor.

The Court finds that Weber conducted this post-petition sale of the debtor's property and distributed a portion of the proceeds to himself and Bates with full knowledge that the debtor was not receiving a reasonably equivalent value in exchange. Under these circumstances it would be anomalous to permit Weber to share in any of the assets of the estate. Section 329 of the Bankruptcy Code permits the Court to deny altogether compensation to an attorney, to cancel an agreement to pay compensation, or to order the return of compensation paid, if the compensation paid exceeds the reasonable value of the services provided. 11 U.S.C. § 329(b); *see* House Report No. 95–595, 95th Cong. 1st Sess. (1977) 329; Senate Report No. 95–989, 95th Cong. 2d Sess. (1978) 39–40, U.S.Code Cong. & Admin.News 1978, p. 5787. The instant case is one in which the Court should require the return of all compensation paid. When one considers the entire services performed by Weber, it becomes apparent that Weber distributed the proceeds from sales of the debtor's property unreasonably and primarily with the intent to benefit himself and others at the expense of the debtor.

---

**1.** A copy of the proposed findings of fact and conclusions of law submitted by the Trustee are appended hereto.

Weber's conduct surrounding the pre-petition sale of the inventory and equipment especially militates against allowing him any fee for either the pre-petition or post-petition sales. As to the pre-petition sale, the Court finds that Weber's retention of $5,250 and his transfer to Bates of $18,-417.50 were fraudulent and that the Trustee is entitled to the return of these amounts. Weber knowingly retained an excessive fee and he transferred the sum to Bates with the knowledge that Bates would not return this amount to the debtor or distribute it on the debtor's behalf.

The plaintiff is entitled to the return of the amount awarded to Weber pursuant to this Court's Decision of July 15, 1981. The Decision merely examined the reasonableness of Weber's fees in view of the specific services performed. There is no basis for insulating such an award from an attack under section 548(a)(2). Weber transferred the funds to himself within one year before the date of the filing of the petition, the debtor received less than a reasonably equivalent value in exchange (i.e., the Court found in its Decision that the award was highly excessive), and the debtor was insolvent when Weber retained his fee. A transferee that takes for value and in good faith has a lien against the estate for the value given. The Court's finding that Weber knowingly took an excessive fee and transferred property to Bates with knowledge that the money would not be returned to the debtor necessarily constitutes a finding of bad faith.

Weber argues that his transfer of the proceeds of the pre-petition sale to Bates was not a transfer within the meaning of section 548. Weber argues that after deducting his fee he transferred the balance to Bates in Bates's capacity as attorney for Carousel, and that therefore there was no transfer from the debtor. The Court finds, however, that Weber knew that the money he was transferring to Bates would not be returned to the debtor. Weber pleaded a lack of any such knowledge, but such an assertion is hardly credible in view of Web-

er's involvement with Hershey and Bates, Weber's de facto status as chief operating officer of Carousel, and his unilateral retention of patently excessive fees. Furthermore, Weber offered no explanation for transferring these funds of the debtor from New York to Florida. In sum, the Court found Weber's testimony generally lacking in credibility. Weber's blatant disregard for preserving the assets of the entity he purportedly represented can only lead to a conclusion that he was part and parcel of a scheme to emaciate the debtor on behalf of himself, Bates, Bertonazzi and Hershey.

The Court wishes to emphasize that its focus herein upon Weber is merely a response to Weber's presentation of arguments on his behalf presented at closing arguments and in his proposed findings of fact and conclusions of law. The Trustee's proposed findings of fact and conclusions of law as adopted by this Court have solid bases in the evidence presented at trial and sufficiently demonstrate the fraudulent conduct of the remaining defendants.

The Court finds for the Trustee in all respects.

Settle Judgment.

### APPENDIX

### PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

This action having come before the Court on September 13, 14 and 15, 1982, for trial, and the Court having heard the testimony of all parties and all counsel having been heard in open Court,

The Court now makes the following Findings of Fact and Conclusion of Law [1]:

### FINDINGS OF FACT

(1) A petition for involuntary bankruptcy of Carousel Candy Co., Inc., debtor and Plaintiff, pursuant to 11 U.S.C., Chapter 7

---

1. For the sake of clarity, each of the defendants will be identified by his last name only. The transcript for September 13 will be identified as

Day 1; for September 14, as Day 2, and for September 15 as Day 3.

was filed with the Court on February 11, 1980. (Plaintiff's Request to Admit ("R/A") No. 1).[2]

(2) Thereafter, and pursuant thereto, an Order for relief was entered on March 6, 1980. (R/A No. 2).

(3) Plaintiff is the duly-designated trustee in bankruptcy of Carousel Candy Co., Inc. # 880–00672–20.

(4) Defendant WILLIAM WEBER is an attorney admitted to practice in the State of New York. (R/A, No. 3; Day 1, p. 60, lines 7–10).

(5) Defendant DOUGLAS BATES is an attorney admitted to practice in the State of Florida (R/A No. 4; Day 1, p. 71, line 23–25 to p. 72, lines 1–2).

(6) Defendant CHARLES BERTONAZZI was and still is the sole stockholder and President of FLORIDA CANDY & NUT CO., INC. ("Florida"), a Florida entity which was incorporated March 10, 1980 (R/A, Nos. 6 and 7; Day 1, p. 115, line 21–25, to p. 116, line 7). He was its sole proprietor prior to its incorporation, and actually conducted all transactions involving FLORIDA prior to March 10, 1980. (R/A, Nos. 8 and 9).

(7) SAUL HERSHEY (formerly known as Saul Hershkowitz), was and still is the sole shareholder and de facto chief executive officer of the debtor at all times referred to in this action. Formerly a defendant in this action, HERSHEY failed to prove his claim that he had transferred his interest in the debtor to defendant BERTONAZZI. He conceded that he never assigned his stock certificate to BERTONAZZI, and BERTONAZZI never received it. (Day 1, p. 125, lines 3–8; Day 2, p. 88, lines 3–7.) In October, 1982, HERSHEY filed a Chapter 7 petition in Florida. He has since been severed as a party defendant and is no longer involved in this action.

(8) Vincent Matranga was designated President of the debtor by HERSHEY in November 1979, following the resignation from the presidency of HERSHEY's son

Steven Hershkowitz ("Steven"). Matranga had been warehouse manager for the debtor, and had no prior experience at corporate management; he did HERSHEY's bidding and followed his orders. (Day 1, p. 48, lines 10–24; p. 49, line 12; p. 53, lines 15–19; Day 2, p. 15, line 25 to p. 17, line 12; p. 32, lines 13–20).

(9) Some time prior to October, 1979, defendant BERTONAZZI was engaged as consultant for the debtor by HERSHEY in connection with a possible relocation to Florida of the debtor and its business. At that time, Steven was the debtor's president. (R/A, No. 12; Day 1, p. 103, line 2–25 to p. 104, line 19; p. 121, line 13–19; Day 2, p. 31, lines 6–11; Day 3, p. 84, lines 6–25).

(10) HERSHEY (at BERTONAZZI's recommendation) first engaged defendant BATES in October 1979 to represent him in certain Florida proceedings in connection with a divorce. BERTONAZZI was also acquainted with WEBER. (Day 1, p. 72, lines 3–10, p. 74, lines 5–12; Day 2, p. 51, lines 5–11; Day 1, p. 109, line 17; p. 115, lines 12–16; Day 2, p. 134, lines 18–20; p. 136, lines 18–25 to p. 137, line 2).

(11) BATES, at HERSHEY's request, engaged WEBER to represent HERSHEY in his divorce proceedings in New York. Subsequently WEBER was engaged in early January 1980 to represent the debtor. (R/A, No. 10; Day 1, p. 130, line 22–24; p. 131, line 16–17; p. 52, line 4–10; p. 60, line 21–22; p. 62, line 3–12.) In December, 1979, BATES began, at HERSHEY's request, to represent the debtor in Florida. (Day 2, p. 134, line 25 to p. 135, line 1–4; p. 109, line 5; lines 14–15; p. 111, line 16–18; p. 126, line 13–15; Day 1, p. 162, line 8–13; p. 72, line 14–23; p. 63, line 4–11; p. 82, line 6–10.)

(12) The defendants knew no later than the middle of February 1980 that the petition in bankruptcy had been filed. (Day 1, p. 80, line 14–21; Day 2, p. 177, line 13–15).

---

**2.** Unless otherwise noted, defendants made no response to plaintiff's Request for Admissions. Pursuant to Rule 36, the material is thus deemed to be admitted for the purpose of these proceedings.

## I. THE SECTION 548 ACTION FOR FRAUDULENT CONVEYANCE

### A. THE TRANSACTIONS

(13) In January and early February of 1980, WEBER, as attorney for debtor, sold off equipment and inventory that belonged to the debtor for a total of $29,165.00 (R/A, No. 13). He subsequently returned to Steven the sum of $2,500.00 which Steven had paid him as a deposit toward the purchase of some of the equipment, (which purchase was not consummated,) leaving in his hands the sum of $26,665 (the "Fund"). (R/A, No. 13; R/A Exhibit 1; Exhibit 2A.)

(14) From the Fund, WEBER paid himself a fee of $5,250.00 for his legal services to the debtor. (R/A, No. 16).

(15) Between January 25 and February 5, 1980, WEBER sent BATES the sum of $18,417.00 from the Fund (R/A, No. 17). BATES knew that this money resulted from WEBER's sales. (R/A, Exhibits 3A 3B; Day 2, p. 4, line 7–8; p. 10, line 25 to p. 11, line 2; p. 64, line 5–7; Day 1, p. 79, line 8–25 to p. 80, line 5; p. 82, line 17–25 to p. 83, line 6; Second R/A, Exhibit annexed thereto).[3]

(16) Approximately $4500 of this money was sent to BATES as a "fee" he had allegedly earned "for prior services" rendered; whether to HERSHEY or the debtor was not made clear. The rest was sent to him as attorney for the debtor. (R/A, Exhibit 2B; Day 1, p. 79, line 17–18 and throughout to page 88.)

(17) At HERSHEY'S request, BATES paid $2017.78 to American Express, in payment of HERSHEY'S personal obligations. (R/A, No. 20; Day 1, p. 83, line 19–25 to p. 84, line 7; Day 2, p. 66, line 11–25 to p. 77, line 8; p. 85, line 9; p. 68, line 7–25 to p. 74, line 18.)

(18) From the Fund, BATES paid himself $1875.00 at HERSHEY'S direction for services rendered to HERSHEY in connection with his divorce. (R/A, No. 21; Day 1, p. 80, line 2–5; Day 2, p. 11, line 4–6.)

(19) BATES also paid BERTONAZZI (and his alter ego, FLORIDA,) a total of $10,035.00 for "consulting services" rendered to the debtor at HERSHEY'S request. (R/A, Exhibit 4; Day 1, p. 87, line 19–20; p. 90, line 7–9; p. 85, line 12–25 to p. 86, line 11; Day 1, p. 103, line 22–25 to p. 105, line 25; p. 111, line 21–23; p. 112, line 2–9; line 15–25; p. 115, line 4–10; Day 3, p. 85, line 8–9).

(20) BATES retained the remainder of the Fund as payment for legal services he allegedly rendered to the debtor. However, he had no written retainer agreement with the debtor; he never billed the debtor, and he produced no time records to document the hours he spent on the debtor. (Day 1, p. 89, line 4–5; Day 2, p. 3, line 25 to p. 4, line 10; Day 3, p. 72, line 5 to p. 73, line 14).

(21) BERTONAZZI testified that he was sent by HERSHEY on several occasions to "help out at the warehouse" and he met once with the insurance adjusters concerning the debtor's claim for fire damage, but otherwise produced no time records or diaries to evidence the time he actually devoted to the debtor. Indeed, he indicated that the "arrangement was friendly" and that he expected to join HERSHEY in the debtors's business following its move to Florida. (Day 1, page 105, line 3–7; page 108, line 11–22; p. 112, line 10–25; page 118, line 3–10). He "estimated" that the debtor owed him about $17,500 by February 11, 1980, the date the petition in bankruptcy was filed. (Day 1, p. 113, line 7–13; p. 118, line 17–25).

(22) On March 3, 1981, prior to the commencement of this action, WEBER was examined, pursuant to 11 U.S.C. § 329, on the reasonableness of the fee he retained. (Day 2, page 171–172). The Court thereafter awarded him $3,500.00, plus $35.00 disbursements, and he was ordered to return the rest ($1,715.00) to the Trustee. (R/A,

---

**3.** Defendant WEBER responded to plaintiff's Second Request for Admissions by admitting that he sent the letter referred to, but denying its truth. His own statement of the transactions, which is annexed to plaintiff's First Request for admissions as Exhibit 2A, shows that sales to the parties he referred to in his letter did take place; thus it can only be inferred that this part of the letter was admitted, and that the denial applied to a different statement.

No. 23.) WEBER has complied with this Order.

(23) An Order of this Court was entered October 6, 1980 directing WEBER to turn over to Plaintiff the balance of The Fund then in his hands ($2600.00), and WEBER duly complied. (R/A, No. 19.)

(24) Thus, until bankruptcy proceedings were instituted, the proceeds of the sale of the debtor's equipment and inventory were retained by the debtor's attorneys BATES and WEBER, and were used to pay HERSHEY'S bills, DEFENDANT BERTONAZZI or attorneys' fees. No part of the Fund was turned over to the debtor for payment of corporate obligations, of which the defendants were aware. See paragraph 27(b) and 30 below.

## B. THE DEBTOR'S INSOLVENCY

(25) An insurance claim arising from a fire on the debtor's premises on October 3, 1979 was settled in December, 1979, for $174,000.00. The settlement check was deposited in December, 1979 in the debtor's regular checking account at European-American Bank and Trust Co., Inc. (the "Bank"), a secured creditor of the debtor. At some time prior to January 10, 1980, the Bank offset the proceeds of this check against its outstanding loan, leaving still due the sum of $39,050.10. This money was thus not part of the debtor's assets on January 15, when the sales began. (Day 1, p. 27, line 23–25; p. 34, line 4–5; p. 35, line 9–18; p. 37, line 19–24; p. 72, line 23; p. 74, line 19–21; p. 93, line 20–25; p. 123, line 15–18; Day 2, p. 33, line 22–25 to p. 34, line 5; p. 35, line 5–12; p. 112, line 9; R/A, No. 24).

(26) WEBER'S sales of the debtor's equipment and inventory took place on or after January 15, 1980, after the Bank's offset of the insurance check. (R/A, Exhibit 2A.)

(27) At the time of the sale:

(a) The debtor's assets did not exceed $100,000.00, while its liabilities exceeded $250,000.00. (Day 1, p. 29, line 13–25 to p. 30, line 2; p. 38, line 24–25; Day 2, p. 151, line 15–25 to p. 152, line 2; p. 84, line 24–25).

(b) The debtor was unable to meet its current obligations to creditors and lacked funds even to pay Vincent Matranga, its then-President, his salary. (Day 1, p. 54, line 5–9; p. 64, line 7; p. 75, line 11–16; Day 2, p. 33, line 8–10; page 34, line 6–8; p. 45, line 3–11; p. 85, line 3; p. 88, line 8–22; p. 134, line 4; p. 142 line 20 to p. 143, line 3.)

(c) The debtor was effectively out of business and "couldn't continue". Its equipment was water-damaged, rusting and useless. The debtor's peanut roaster, which had been damaged in the fire, was of dubious value. (Day 1, p. 30, line 15–17; Day 2, p. 32; line 21–25 to p. 33, line 7; p. 59, line 9–11; p. 97, line 20–23; p. 98, line 15–16; p. 10, line 3–5; p. 9, line 11–12; line 21–23; p. 35, line 9–15; p. 34, line 6–8; p. 32, line 24–25; p. 33, line 2–6; p. 84, line 9–10; line 23–25 to p. 85, line 3; p. 88, line 9–15).

(d) HERSHEY said that the debtor was worth nothing. (Day 2, p. 38, lines 10–15; p. 88, lines 3–22; p. 89, lines 2–3).

(e) The action of the Bank in seizing the insurance settlement check gave the debtor its death blow. (Day 2, p. 35, lines 9–11).

28. WEBER conceded the expertise and qualifications of the plaintiff's expert witness, HERBERT BRANDVEIN, C.P.A., who testified that the debtor was insolvent at the time the sales occurred. (Day 1, p. 25, lines 3–9).

29. In October or November, 1979, the debtor, through HERSHEY and at the suggestion of BERTONAZZI, consulted the law firm of ROSS DILORENZO concerning the advisability of filing a petition in bankruptcy, and discussed with BATES the feasibility of declaring bankruptcy. BATES at that time advised the debtor that there was a possibility, after the Bank had offset the insurance settlement check, that creditors would file an involuntary petition. (Day 2, p. 10, lines 7–18, p. 133, lines 2–15; p. 134, lines 13–14; p. 170, lines 3–7.) Furthermore, WEBER recommended that the debtor declare bankruptcy, (Day 1, p. 143, line 15).

30. The defendants and HERSHEY were all aware that creditors were demanding payment. (Day 1, p. 62, line 7–10; p. 75, line 11–16; Day 2, p. 33, line 8–10; p. 134, lines 2–4; Day 3, p. 56, lines 12–17).

31. BATES was so concerned about payment of his fee that he obtained a personal guarantee that HERSHEY would pay his fee. (Day 1, p. 73, lines 15–19; p. 161, lines 10–14; p. 88, line 20; p. 162, lines 7–14; Day 2, p. 4, lines 14–16; Day 3, p. 63, lines 2–8.)

32. Defendants introduced no evidence to show the value of certain alleged contingent claims the debtor had against Oroko [4] (a supplier); the Bank, and Sleepy Hollow Farms, Ltd., a subsidiary.[5] Plaintiff established that there was no claim against Sleepy Hollow Farms; plaintiff's expert witness valued the debtor's contingent claim against Oroko at $1000 (Day 1, p. 37, lines 10–17) and the claim against the Bank is currently in litigation, Adv. # 882–0142–20. (Day 1, p. 35, lines 22–25; p. 36, lines 18–25; p. 42, lines 7–9; p. 102, lines 6–20; p. 146, line 24; Day 2, p. 56, line 17 to p. 57, line 19.)

33. In March 1980, defendant WEBER, who was in charge of the prosecution of the debtor's claim against Oroko, failed and refused to appear to represent the debtor at a pre-trial conference in the case. The debtor's action was dismissed as a result. (Day 3, p. 33, line 18 to p. 35, line 17).

## II. THE SECTION 549 ACTION FOR POST–PETITION TRANSFER

34. At the end of January 1980, the debtor still owed the Bank $39,050.10 on its outstanding loan. (R/A No. 24.) To pay off this obligation, defendants WEBER and BATES devised the following scheme:

35. HERSHEY borrowed $40,000 from the Bank, pledging negotiable securities as collateral. The proceeds of the loan were used to liquidate the debtor's outstanding obligation to the Bank. The Bank prepared the loan documents and sent them to

BATES in Florida for execution by HERSHEY. (R/A, No. 25; Day 1, p. 138, lines 4–25; Defendants, Exhibit D in evidence.) BATES' Exhibit VII in evidence; Day 3, p. 79, lines 17–21; p. 80, lines 19–22).

36. On or about January 29, 1980, the Bank assigned the loan documents, and thereby its lien against the debtor, to Florida (i.e., BERTONAZZI). (R/A, No. 27; R/A, Exhibits 6 and 7; Day 1, p. 139, lines 7–8; Day 2, p. 152, line 9 to p. 155.) WEBER as Attorney for Florida filed the assignments with the Clerk of Suffolk County and with the Secretary of State of the State of New York (R/A, No. 30 and Exhibit 7).

37. WEBER, representing Florida, promptly caused an auction to be held to release the lien on two of the debtor's packaging machines (R/A, No. 31; Day 1, p. 139, lines 19–24). The auction sale was duly advertised in *Newsday* (R/A, No. 33).

38. On February 15, 1980, after the petition had been filed, the newer of the two packaging machines was sold for $50,700 to Cendee Confectionery and Nut Products Ltd., a corporation owned by Murray Cohen, a former associate of HERSHEY'S and a co-founder of the debtor corporation. (Day 2, p. 156, line 25 to p. 157, line 7; p. 175, lines 6–7.) The connection between HERSHEY and Cohen was common knowledge in the industry. (Day 2, p. 157, line 5–10). The release constituting the bill of sale was signed on February 15, 1980 by "CHARLES BERTONAZZI, President of Florida Candy & Nut Co., Inc." (R/A, Exhibit 11; Day 2, p. 144, line 21–22).

39. WEBER knew of Cendee's interest in the packaging machine on January 7, 1980, even before HERSHEY's loan agreements were executed. It took him only two weeks to find a buyer. (Day 2, p. 175, lines 16–17; p. 173, lines 20–25 to p. 174, line 4; p. 186, line 16–25).

40. The other packaging machine was sold on February 25, 1980 to Rocco Damato

---

**4.** This is the correct spelling of the name; the spelling in the transcript is incorrect throughout.

**5.** Sleepy Hollow Farms, Ltd., was a corporation wholly owned by Steven which operated out of the debtors premises. (Day 2, p. 20, line 20–22; p. 21, line 2–3; p. 56, line 12 to p. 57, line 12.)

for $10,000. The release in this sale also ran from "Florida Candy & Nut Co., Inc.," by CHARLES BERTONAZZI, President. (R/A, Exhibit 11; Day 2, p. 144, lines 21–22.)

41. HERSHEY'S loan from the Bank was paid in full from the proceeds of this sale ($40,752.33, including accrued interest) and the Bank returned his pledged securities to him. WEBER, on behalf of BERTONAZZI and as his attorney, then filed terminations of the assignments with the Secretary of State and the Clerk of Suffolk County, thus terminating BERTONAZZI'S lien and interest on the debtor's property. (R/A, Nos. 37 and 38; Day 1, p. 141, lines 23–25 to p. 142, line 4; R/A, No. 39; Day 2, p. 40, lines 3–6; R/A, No. 41, 42 and 43; Day 1, p. 144, line 25 to p. 145, line 13; p. 142, lines 21–23; p. 145, lines 7–9.)

42. After repaying the Bank and paying the necessary expenses of the sale, WEBER had on hand approximately $15,400, representing the $11,000 referred to in the Complaint and Requests to Admit, No. 44 and 45, and an additional $4,400 in his escrow account, which he paid to the Trustee by Order of this Court in June 1981. (R/A, Nos. 44 and 45; Day 1, p. 144, line 19; Day 3, p. 25, lines 18–22; p. 26, line 21; p. 27, lines 9–20).

43. Following the filings of the terminations of assignment, the debtor's peanut roaster, which measured between 15–18 feet high and from 10–15 feet wide was placed in storage with Valiant Moving & Storage at a monthly rental of between $800 and $900. Although he was attorney for the debtor, WEBER indicated that he did not know who put the roaster in storage, or how long it was there (Day 2, p. 182, lines 6–23; p. 182, lines 6–20; p. 50, lines 7–10; Day 3, p. 26, lines 8–9; p. 50, lines 7–10).

44. WEBER was aware of the interest in this roaster expressed by Edward Dicker, President of Durey-Libby Nut Co., Inc. Durey-Libby offered to buy the roaster for $60,000 provided it was repaired. WEBER had in his possession more than the $12,000 needed to repair the roaster, but he chose instead to pay himself a fee of $6,000.00

for legal services rendered to Florida and to pay $5,000.00 to BERTONAZZI. His primary interest lay in being paid. (Day 2, p. 179, lines 23–25 to page 181, lines 16; Day 3, p. 27, liens 2–20; R/A No. 45 and Exhibit 14; Day 2, p. 179, lines 9–10; p. 177, lines 5–8; Day 3, p. 29, lines 6–13; p. 27, lines 12–16; R/A, No. 44; Day 2, p. 176, line 25 to p. 177, lines 2–19).

45. WEBER looked to Florida as the source of payment of his bill. He testified that he represented Florida, not the debtor, in this transaction, although at the same time he admittedly represented HERSHEY and the debtor. He saw no conflict of interest in this dual representation. (Day 2, p. 178, lines 15–17; Day 1, p. 142, lines 24–25; Day 3, p. 100, lines 1–19; p. 140, lines 4–13; p. 142, lines 24; p. 143, line 6; Day 3, p. 78, lines 11–24; Day 1, p. 143, lines 7–25; Day 2, p. 183, lines 13–17; Day 1, p. 164, line 13 to p. 165, line 9.)

46. BERTONAZZI testified that he made only two trips to New York after February 11, 1980, and introduced no time records to document the time he spent. The record fails to show what he did with respect to these transactions.

47. WEBER also failed to show time records or diaries to document the time he spent on the sale of these machines, but he testified that he spent approximately 29 hours on this matter. At an hourly rate of $75.00, his fee would be $2,175.00 (Day 2, p. 178, lines 23 to p. 180, line 8). Yet he paid himself the sum of $6,000.00 or almost three times as much (R/A, No. 45; Day 2, p. 142, line 25).

48. After the Order for relief was entered, WEBER lost interest in representing the debtor because he was not being paid. (Day 2, p. 183, lines 10–16).

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and the subject matter pursuant to 28 U.S.C. § 1471(b) and (c).

2. At the outset, the Court holds that the defendant BATES' objection to plaintiff's Requests for Admission (hereaf-

ter "Requests") on the ground that they were served on defendants after the ·date by which all discovery was to be concluded is without merit. Requests for Admissions, pursuant to FRCP 36, are in the nature of a Pre-Trial Order in that they are designed to narrow issues and eliminate those over which there is no dispute. They are not designed to be a discovery device, *McLaughlin v. Drackett Products Co.*, 20 Fed.Rules Serv.2d 1081 (1975). Plaintiff's Requests are, therefore, admissible, and as to requests to which defendants failed to respond, those issues are deemed to have been proved for the purposes of this action.

## I. THE FRAUDULENT TRANSFER —§ 548

3. Within one year prior to the filing of the Chapter 7 petition, and at a time when the debtor was insolvent, the debtor, by its attorneys defendants WILLIAM WEBER and DOUGLAS BATES, transferred its assets to third parties; the debtor itself received nothing. All monies received by WEBER following sales of the debtor's inventory and equipment were either retained by BATES and WEBER, or were used to pay personal obligations of the debtor's sole shareholder, SAUL HERSHEY, or were paid over to defendant, CHARLES BERTONAZZI, a favored creditor who had, by virtue of his relationship with HERSHEY, the status of a *de facto* insider. The transaction fits like a glove the conduct described in § 548(b) of the Code as constituting a constructive fraudulent transfer.

4. The record and testimony amply demonstrate that the transfers were made by persons who controlled the debtor, not for the benefit of any of the creditors but "... [in] the imminence of insolvency to remove [the] assets from the reach of [the] creditors and preserve them for their own enjoyment [or purposes]. This is precisely what occurred here." *In re Vaniman International,* 22 B.R. 166 (B.C., E.D., N.Y. 1982)· at p. 180; see also *New York Credit Men's Adjustment Bureau, Inc. v. Adler* 2 B.R. 752 (D.C., N.Y., 1980); *In re Checkmate Stereo & Electronics Ltd.,* 9 B.R. 585 (B.C., E.D., N.Y., 1981, aff'd 21 B.R. 402, U.S.D.C., E.D., N.Y., 1982).

5. When defendants realized that the debtor was beyond hope of revival, they decided to strip it of saleable assets and to help themselves, and no one but themselves, to the proceeds. They could not have expressed greater contempt for the legitimate claims of the creditors of whose existence all of them were very much aware. This conduct is among the "badges of fraud", which spell out an actual intent to divert assets away from creditors, *In re Vaniman, supra,* at p. 182.

In *Rubin v. Manufacturers' Hanover Trust Co.,* 661 F.2d 979 (2nd Cir., 1981), Circuit Judge Kearse, writing for a unanimous court, described as follows the soil from which fraudulent conveyances grow:

"When an overburdened debtor perceives that he will soon become insolvent, he will often engage in a flurry of transactions in which he transfers his remaining property, either outright or as a security, in exchange for consideration that is significantly less valuable than what he has transferred. Although such uneconomical transactions are sometimes merely final acts of recklessness, the calculating debtor may employ them as a means of preferring certain creditors or of placing his assets in friendly hands where he can reach them but his creditors cannot. Whatever the motivation, the fraudulent conveyance provisions of § 67(d) of the Bankruptcy Act, 11 U.S.C. § 107(d), recognize that such transactions may ˙operate as a constructive fraud upon the debtor's innocent creditors, for they deplete the debtor's estate of valuable assets without bringing in property of similar value from which creditor's claims might be satisfied." 661 F.2d at 988–89.

Although § 67(d) of the Bankruptcy Act has been replaced by § 548 of the Bankruptcy Code, 11 U.S.C. § 548, Judge Kearse's observations have not lost their pertinence.

5. The attempts by the defendant attorneys to disprove insolvency at the time of WEBER's sales were disingenuous in

the extreme. Their own testimony indicated that the debtor was in disastrous condition, not operating, immobile, and being hounded by creditors. They failed to introduce any evidence of the dollar value they assigned to the debtor's alleged claims against the Bank or Sleepy Hollow Farms Ltd. As to the claim against Oroko, Plaintiff's expert witness testified that he had valued it at $1000, and not at its face value. It is appropriate, in the determination of the question of insolvency, to value doubtful or contingent claims at less than face value, *Coyle v. Archibald McNeil & Sons Co.*, 284 F. 298 (D.C., N.Y., 1922). The estimate of Plaintiff's witness was thus reasonable, in light of his conceded expertise.

6. As to the alleged claim against Sleepy Hollow Farms, Plaintiff has shown to the Court's satisfaction that no claim existed.

7. Finally, the "equity insolvency test" has been met in that the debtor was not paying its debts as they accrued, *Matter of Luftek, Inc.*, 6 B.R. 539 (B.C., E.D., N.Y., 1980). The debtor's insolvency has been proven.

8. As representatives and agents of the debtor, the Defendant attorneys owed it the fiduciary duty to preserve its assets for the benefit of its creditors, *In re D.H. Overmyer Telecasting Co., Inc.* 23 B.R. 823 (U.S., B.C., N.D., Ohio, 1982) at p. 931. It is clear from their testimony that they knew of the existence of numerous creditors, but ignored them, keeping the booty to themselves. As Judge Goetz said in *Vaniman, supra* defendants WEBER and BATES, as attorneys for the debtor, were in the best possible position to know exactly what condition their client was in, and proceeded to take full advantage of their knowledge for their own benefit. It is apparent from their testimony that the defendants attorneys were mainly interested in being paid, and that their sense of duty was exhausted when payment ceased.

9. Consideration is absent when a transfer is made in bad faith, *In re Checkmate Stereo & Electronics, Ltd.*, supra, 9 B.R. at p. 617; *In re Greenbrook Carpet Co., Inc.*, 22 B.R. 86 (B.C., N.D., GA 1982), where the Court said:

"... The lack of good faith imports a failure to deal honestly, fairly and openly." *Southern Industries, Inc. v. Jeremias*, 66 A.D.2d 178, 183, 411 N.Y.S.2d 945 (2d Dep't 1978). Good faith may be lacking because of a transferee's knowledge of a transferor's unfavorable financial condition at a time of the transfer (*Cohen v. Sutherland*, 257 F.2d 737, 742 (2nd Cir.1958)) or because of a transferee's positions as an insider with control over the corporation's finances (*Duberstein v. Werner*, 256 F.Supp. 515 (E.D., N.Y. 1966)). *In Re Checkmate Stereo & Electronics, Ltd.*, 9 B.R. 585, 617 (Bkrtcy., E.D., N.Y. 1981). (at p. 90–91).

And, in *Julien I. Studley, Inc. v. Lefrak*, 66 A.D.2d 208, 412 N.Y.S.2d 901 (2nd Dept. 1979,. aff'd 48 N.Y.S.2d 954, 425 N.Y.S.2d 65, 401 N.E.2d 187 (1979)), the Court said:

"The manipulation of corporate assets by the respondents in the face of the petitioner's rights by preferring the interests of those in control of the corporation reflects bad faith and deprives the respondents of the status of transferees for fair consideration." Id. at 215, 412 N.Y.S.2d 901.

The bad faith of the defendants in this case is demonstrated by the manner in which the money was disposed of. The only persons who gained from the sale of the debtor's assets were the defendants themselves and Saul Hershey. Defendants BATES and WEBER testified that part of their respective jobs was to calm the concerns of dunning creditors that they would not be paid, yet they paid scant heed to creditors' claims when they divided the proceeds. They, who are presumed to know the law, acted with full knowledge of their duties when they chose to ignore them.

10. An action for fraudulent transfer lies against the transferor, and initial, immediate or mediate transferees, or the beneficiaries of such transfers—all persons in whose hands the assets of the debtor come to res, 11 U.S.C. § 550; *In re Checkmate*, supra, 9 B.R. at p. 620. None of the

defendants can claim in the circumstances of this case that he is an innocent transferee.

11. The defendant attorneys WEBER and BATES qualify as "insiders" (11 U.S.C. § 101(25)) since they represented the debtor and were agents of its sole shareholder and defacto president, *In re Vaniman, supra*, 22 B.R. at p. 189. See also *Matter of Montanino*, 15 B.R. 307 (B.C., N.J., 1981), in which the Court said:

The true test of an "insider" is one who has such a relationship with the debtor that their dealing with one another cannot be characterized as an arms-length transaction. 4 Collier on Bankruptcy, para. 547.03(2), note 4 on p. 547–17 (15th ed. 1980) ... relies upon the following excerpt from the House and Senate Analyses of the Bankruptcy Code, while it was pending before Congress:

"An insider is one who has a sufficiently close relationship with a debtor that his conduct is made subject to close scrutiny other than those dealing at arms length with the debtor." Analysis of HR 8200, H.R.Rep. 595, 95th Cong. 1st Sess., 312 (1977); Analysis of S. 2266, S.Rep. 989, 95th Cong.2d Sess. 25 (1978), U.S.Code Cong. & Admin.News, p. 5787. (at p. 310)."

The evidence shows that WEBER the person on the scene in HERSHEY's absence, was de facto in control of the debtor in the months immediately preceding the filing of the petition.

12. There was likewise a very close relationship between defendant BERTONAZZI and HERSHEY. BERTONAZZI supplied HERSHEY with both of the defendants attorneys and was placed in certain positions of responsibility with respect to the debtor that amounted to control. He testified to trips he took to the debtor's plant to "take care of things" and expected to become part of the debtor's management when it relocated to Florida. In fact, the relationship was so close that HERSHEY believed that he had turned the debtor over to BERTONAZZI! Under these circumstances defendant BERTONAZZI also ranks as an insider, not an innocent trans-

feree. He was as privy as the attorneys to the debtor's misfortune.

13. Thus, WEBER as initial transferor, is liable to the trustee, pursuant to § 550, for $21,917.00, the entire amount realized from the sale of the debtor's assets, including the sum awarded to him as counsel fees. As attorney for the debtor, WEBER had a fiduciary obligation to the debtor to protect its assets against raids by or on behalf of its insiders, and to preserve the corporate integrity for the benefit of its creditors, *In re D.H. Overmyer Telecasting Co., Inc.*, supra, 23 B.R. at p. 931. He disregarded this obligation *in toto*. To permit him now to be paid for his services would condone a gross breach of trust. The Court cannot allow an attorney who has so actively participated in a fraudulent transfer to benefit by retaining the proceeds of his misdeeds. Therefore, I now vacate the Order awarding him counsel fees and direct that he pay over to the plaintiff in addition to the money he sent BATES the $3,500 awarded him.

14. The same holds true for defendant BATES. As attorney for the debtor in Florida, he was equally aware of the debtor's imminent collapse. He testified to his desperate efforts to compel the Bank to release the insurance check, to give the debtor funds to work with. He knew that the money sent to him by WEBER resulted from sales of the debtor's assets, and not from normal business operations. He knew that there were creditors pressing for payment. Yet he did nothing to protect the Fund for the benefit of the debtor. He used part of the Fund to pay HERSHEY's personal obligation to American Express and awarded himself a fee for services to HERSHEY in connection with the divorce. Both of these payments were obviously on behalf of HERSHEY personally and had nothing to do with the debtor. They must be repaid.

15. The payment to BERTONAZZI, which was at best a preference, hence voidable by the 11 (11 U.S.C. § 547), was also a payment to an insider who was intimately involved with the debtor and its principal. It was a clear diversion by BATES of the

debtor's assets away from the legitimate claims of other creditors, and a further breach of his obligation to his client. BATES as a mediate transferee of the Fund, with knowledge of its origins, is liable to the trustee for $18,417, the entire amount received from WEBER.

16. This sum also includes the money WEBER sent BATES on January 25, 1980, as a fee for "past services" to the debtor. To the extent that this fee was for services BATES rendered more than 45 days prior to the date of payment (December 10) it was a preference, voidable by plaintiff pursuant to 11 U.S.C. § 547, and must be paid back to the debtor. If the fee was for services rendered to the debtor after December 10, this sum, together with the rest of the money BATES retained as fees, is subject to examination by the Court pursuant to § 329 as having been paid "in contemplation of bankruptcy."

17. Most of BATES' testimony constituted an effort to justify his fees, and was the equivalent of a § 329 hearing on the reasonableness of the fees. In the circumstances presented here, the Court cannot conceive of permitting him a fee! His active participation in the diversion of assets to the detriment of known creditors deprives him as well as WEBER of any right to an award.

18. Defendant BERTONAZZI is liable to the trustee for the $10,035.00 he received from BATES. BERTONAZZI was a *de facto* insider, in light of his close rapport with HERSHEY and the various nebulous roles he was called upon to play with respect to the debtor. Indeed there is evidence to show that the "arrangement" between BERTONAZZI and HERSHEY was "friendly" and that BERTONAZZI expected to be included in the debtor's enterprise when it moved to Florida. His anticipated reward then would not be monetary but a share of the business. In any event he was equally aware of the moribund condition of the debtor and of the demands being made by creditors. He cannot by any stretch of the imagination claim the status of a bona fide transferee. At best, payment to him was for antecedent services, hence a preference voidable under § 547. The trustee is entitled to repayment of the entire amount from defendant, BERTONAZZI.

19. American Express is clearly a bona fide transferee of the payment BATES made for SAUL HERSHEY. The trustee thus has no claim against American Express, but BATES is liable, as mediate transferee, for having knowingly made the payment on behalf of an insider.

20. The trustee is entitled to only one satisfaction of this obligation, 11 U.S.C. § 550(c). Thus, each defendant is relieved of his obligation, *pro tanto*, to the extent that any other defendant disgorges the improper payment he received.

## II. THE POST–PETITION TRANSFER —§ 549

21. The sales of the two packaging machines by WEBER took place on and after February 15, 1980, after the petition was filed, and clearly qualify as post-petition transfers. The record shows that WEBER realized $60,700 from the sale of the two packaging machines. From this sum, he paid the Bank the entire balance of the debtor's loan ($40,752.33) and after paying the expenses of the sale (which the plaintiff did not question), he was left with $15,400. By Court Order, WEBER has paid $4,400 of this money to the plaintiff; the record shows and he admitted that he paid $5,000 more to BERTONAZZI and retained $6,000 as his "fee" for this transaction.

22. Under § 550, the trustee has a claim against all transferors and immediate and ultimate transferees who are not bona fide purchasers for value. However, § 549(b) protects payments made for contemporaneous value received, including services rendered, in the interval between the filing of an involuntary Chapter 7 petition and the appointment of a trustee. In this case, the trustee was appointed on March 6, 1980.

23. The debtor received some benefit from these transactions, because the money realized by the sales enabled it to satisfy the outstanding balance of its debt to the Bank. For this service, defendant, WEBER, who was responsible for the transactions, would be entitled to a fee.

24. However, the amount awarded will be affected by the speed and facility with which he found a buyer. The record shows that he has a prospective purchaser for the more costly machine as early as January 7, 1980. This eased his burden considerably. The record also shows that he had sufficient money on hand to repair the damaged roaster for Durey-Libby, a prospective buyer who offered $60,000 for it, but that he—once again—callously put his own interests ahead of those of his prostrate client and chose instead to pay himself and his fellow-insider BERTONAZZI. Such conduct does not merit condonation or reward.

25. The picture of divided loyalty and dual representation demonstrated by the evidence will also affect the award. WEBER testified that in this network of transactions he represented not the debtor but Florida, a party adverse in interest to the debtor. Florida's interest in the debtor's assets was limited to approximately $39,000, the amount of the lien assigned it by the Bank. Thus, once the Bank had been paid, Florida had no claim to any excess remaining from the sale. Such excess belonged to the debtor. Weber admitted that Florida had no claim to this money after the Bank was paid, yet he paid Florida (through BERTONAZZI) $5000.

26. Because the debtor was in fact substantially benefited by the satisfaction of its loan with the Bank, the Court is constrained to award WEBER a fee. However, the $6000 he retained is grossly excessive in light of the number of hours he spent, his hourly rate, his divided loyalties and his breach of fiduciary duty to the debtor. I therefore award him a fee of $_____, and direct that he pay over to the trustee the balance of the $6000.

27. Defendant, BERTONAZZI, must turn over $5000 to the plaintiff. Florida's (and BERTONAZZI's) claim to the proceeds of the sale was co-extensive with the debtor's outstanding obligation to the Bank and no more; it had no interest beyond the approximately $40,000 involved in the assignment. Florida (and its principal BER-TONAZZI) had absolutely no right to that money, and it must be returned to the plaintiff. As an insider with respect to the debtor, BERTONAZZI was fully aware that the sales were being made not to benefit Florida, but to pay off the Bank. He was also aware that Florida had no legitimate claim to any part of the proceeds.

28. BERTONAZZI is entitled to retain only such payment that is attributable to *contemporaneous* services rendered in the interim between the date the petition was filed (February 11, 1980) and the date a trustee was designated (March 6, 1980). Nothing in the record indicates contemporaneous services worth $5,000.00. He apparently did little more than sign his name to papers in BATES' office and make a few phone calls. He referred to two trips but did not indicate their purpose, or what was accomplished. BERTONAZZI must return $5000 to the trustee in its entirety.

29. Once again, plaintiff is entitled to only one satisfaction. To the extent BERTONAZZI pays $5000.00 or any part of it to plaintiff, WEBER'S liability for payment of that portion of the award is abated.

The foregoing constitutes the decision of the Court in this matter.