Charles David **MALEY, Trustee in Bankruptcy of National Lumber Company, a division of C. M. Paul Lumber Co., Bankrupt, Plaintiff,**

v.

**EAST SIDE BANK OF CHICAGO, an Illinois corporation, Defendant.**

No. 63 C 1508.

United States District Court
N. D. Illinois, E. D.

Oct. 19, 1964.

· John D. Schwartz, George W. Overton and Robert E. Don, of Overton, Marks & Schwartz, Chicago, Ill., for plaintiff.

Simon, Teitelbaum & Wolfberg, Chicago, Ill., for defendant.

ROBSON, District Judge.

The trustee in bankruptcy of the National Lumber Company has moved for summary judgment against the East Side Bank of Chicago, which motion is opposed on the ground that genuine issues of fact exist which preclude the granting of the motion.

An oral memorandum opinion announced December 17, 1963, on the motion to dismiss, sets forth many of the facts involved in this controversy.

The court concludes that the plaintiff's motion for summary judgment should be granted in that there is no seriously contested issue of any material fact, but simply of the legal consequences which flow from the undisputed facts. The trustee has submitted a scrupulously meticulous presentation of the facts which the defendant has in no wise undermined, merely asserting a right to have an opportunity to cross-examine. Most of the material facts are found in defendant's own bank records, its then chief officer's and employee's answers on oral interrogation, and in the affidavits of creditors of the bankrupt.

The essential facts are that one Mort Schulman, who had been adjudicated a bankrupt in 1961, purchased the National Lumber Company, the instant bankrupt, in December, 1962. National Lumber Company had been a going company with a good credit rating with Dun & Bradstreet and with defendant bank. Schulman, with lightning speed, used that good credit rating to purchase materials (some $66,757.37 from 27 suppliers in two weeks), which he immediately sold, cashing at the bank the checks payable to

bankrupt representing proceeds of those sales. In the majority of cases, he received the proceeds in cash. Some ten of these checks, running from $100 to $9,900 were paid to Schulman completely in cash in an interval of *two weeks*, in January, 1963. The checks were presented to a teller who stated at an ex parte sworn examination that he never had indulged in such a practice before, or since, nor had he ever paid corporate check proceeds to a corporate officer individually. In each of the transactions here involved, he consulted the bank's acting chief executive who approved his action. This chief executive officer's answer on ex parte examination reveals that he had been led to believe by Norman M. Paul, the former owner of bankrupt company, that Schulman was the *sole* owner of the company and therefore had the right to receive the proceeds of company checks. He was also assured by Schulman of the propriety of paying the proceeds of the Company's checks in cash to him on the pretext that he was buying up home show exhibits in toto and needed large sums of cash immediately to pay therefor.

There is an avalanche of evidence in affidavit form and otherwise that sellers of material to Schulman, who are creditors in the bankruptcy proceedings, made earnest effort to ascertain bankrupt's financial standing before making delivery, and were always told by the bank or Dun & Bradstreet of bankrupt's good credit rating. The bank received from fifty to one hundred such calls, its own employees stated. The affidavits of the sellers reveal overwhelmingly corroboration of that fact. Such rush of repeated inquiries had not been made of the Company *prior* to Schulman's acquisition of it and were not made with that frequency of other of the bank's customers. The exceptionally large size of most of the checks ($9,238.67, $5,967.85, $6,267.45, $5,922, $3,461.50, $808.52, $9,900, $548.87 and $3,913.12—some indorsed "For Deposit Only") all within the space of two weeks, and all paid in *cash* (except for one credit of $3,224 credited to Schul-

man's *personal* account) should have alerted a prudent person to the possibility of Schulman's machinations. Every phase of the dealings was exceptional and suspicious—even discounting the enlightenment gained from hindsight. A bank normally does not permit corporate funds to be diverted to individuals; it does not, in a short interval, repeatedly pay large sums in cash; it does not suddenly receive constantly recurring credit inquiries. All these considerations are established by express statements of defendant's employees and by the fact that its chief teller felt it necessary to get *express* authorization in *each* instance to cash the checks made payable to the Company and deliver the proceeds to Schulman.

The court concludes, however, while there was no actual knowing or intentional fraud committed by defendant or its employees, there was gross negligence. It was a case of guilelessness being hoodwinked by an irresponsible reprobate who on apprehension had to seek cover under the Fifth Amendment. The sources of other possible evidence have been devastated by Schulman. The Company's books are gone. He refused, at the bankruptcy hearing, to cast any light on the situation. It is evident no information can be gleaned from him in the future. The bank's employees have made honest and full disclosure of all pertinent facts, all completely corroborated by contemporaneous records made in the usual course of the bank's business and since kept in its custody.

Nor should the binding effect on the bank of the resolution it drafted to govern its dealings with a corporate depositor be gainsaid. There was no compliance with the requirements of the resolution theretofore filed with it.

■ The court can see no possible enlightenment to be gained from a full dress trial on the merits of this controversy. Both the chief executive and the head teller could do no more than repeat the very detailed information heretofore elicited from them on minute interrogation on the transactions of Schulman with

the bank, with the Company and its creditors. The contemporaneous bank records cannot be varied. They are clear and explicit in the amounts of the checks, the payees, the nature of the indorsements, and the precise manner of disposition of the proceeds.

■ As plaintiff methodically points out, the elements of a fraudulent transfer under the Bankruptcy Act have been met (§ 67, sub. d (2) (a))—a transfer by a debtor within a year of bankruptcy, fraudulent as to existing creditors when made without fair consideration by a debtor who is insolvent or thereby rendered insolvent. From the disclosures made by the prior owner, the Company while solvent had accounts payable much in excess of accounts receivable. At the time of bankruptcy, the amount owed unpaid creditors was $193,000 and had assets of only some $9,024.50. When the first check was cashed, there were at least 27 creditors who were owed at least $66,-757.38. Early in these transactions—January 4—the liabilities exceeded the assets by $85,971.55. The court is also in agreement that the evidence here adduced supports the conclusion that the transfers were in violation of subsections (b) and (c) of Section 67, sub. d (2), i. e., that the Company's capital was unreasonably small at the time of the transfer and that the debtor was incurring debts beyond its ability to pay them as they matured.

As to subsection (d) of Section 67, sub. d (2), the court has no doubt of Schulman's actual intent to defraud the Company's creditors.

■ Defendant challenges the quality of plaintiff's proof as not being up to the standard required by Rule 56 of "pleadings, depositions and admissions," in that the allegations of the complaint are denied by the answer, and there are no depositions or admissions. (The one deposition was conducted without counsel for defendant being present because he was detained in court.) However, the rule only provides that the *disposition* of the motion . shall be upon pleadings, depositions, admissions and *affidavits*, if any. The opposing party may file counteraffidavits. There were innumerable affidavits filed and the sworn oral interrogation of defendant's chief teller might be deemed the equivalent of an affidavit or admission. There is ample authenticated documentary proof.

■ Defendant again asserts its nonliability legally because it received no gain from the transfer. The court, however, adheres to the conclusion reached on the motion to dismiss that the complaint states a valid cause of action against the defendant bank as the effective instrumentality in the transfer of the bankrupt's funds, when it received a check made payable to the *Company,* cashed the same and knowingly and with gross negligence gave the cash to someone other than the Company. All of the decisions cited by defendant have significantly differing facts from the instant case. Defendant stresses the factual situation of the bank being advised of the identification of Schulman as the Company, a merger of the Company so to speak in Schulman. Though it be true that there is but a single stockholder in the Company who has a right to its assets, the legal right to those corporate assets is subservient to the right of its creditors. The corporate shell is there for a very real reason—to protect *both* the stockholders *and* the creditors, and the bank could not so lightly assume that the sole stockholder had the absolute right to corporate proceeds. And especially should this be so where the circumstances surrounding the transactions were so fraught with suspicion.

This is not a case where the corporation sustained no loss through the irregular and unauthorized acts of its president, as is the situation in some of the decisions, where the bank is held not liable to the depositor.

Nor, does the court believe it a material distinguishing factor that the checks never were placed in the Company's account and then misappropriated —the loss to the Company was just as real when the bank permitted the step, of depositing, to be skipped and paid out

funds directly to the corrupt employee cashing the Company's checks.

■ A bank cannot legally pay out funds except upon the approval and signature it has been instructed is necessary. Miller v. First Granite City National Bank, 349 Ill.App. 347, 110 N.E. 2d 651 (1953). The case of Kerner v. Kinsey, 384 Ill. 180, 189, 190, 51 N.E.2d 126, 131 (1943), discusses many phases of the instant problem, such as necessity for loss by the corporation through the bank's acts, and the basis of the liability of the bank being predicable on "knowledge of facts sufficient to put it on notice that it is paying out the money of one to another without proper authority." In discussing other cases, it said at pp. 186, 190, 191, 51 N.E.2d at pp. 129, 130, 131:

"* * * These are all cases in which the ownership of the funds on deposit was disclosed and the bank permitted them to be appropriated for the use of the corporate officer, upon no other authority than that of the corporate officer involved.

"The point is that in each case cited the actual ownership of the fund was known, and complaint was made by the actual owner, and liability was predicated upon the fact being sufficient to give the bank notice that a corporate officer was without authority getting possession of corporate funds.

* * * * * *

"While the bank might be liable to the corporation for negligently permitting its officers to deposit corporate funds in the officer's name, yet this is a claim which can be maintained only by the corporation itself.
* * *

"* * * On principle, before a bank can be charged with negligence, it must have knowledge of facts sufficient to put it upon notice, and when it does become liable it is only to one who, under the settled doctrine of commercial law, is the legal holder * * *."

In Federal Savings & Loan Insurance Corp. v. Kearney Trust Co., 151 F.2d 720 (8th Cir. 1945), it is said at pp. 725, 726:

" 'But, if the bank have knowledge that the officer [of the drawer of the check] is using the check for his personal benefit, e. g., to pay his debt to the bank *or to deposit it to his personal credit,* then the bank is put upon inquiry and if it fail to make it, pays at its peril.' * * * In the present instance the defendant bank admittedly had knowledge that Wilson directed the checks payable to the order of the defendant to be credited to his own personal account for his personal use and failed, admittedly, to make inquiry in respect of his authority."

In Feldman v. Capitol Piece Dye Works, Inc., 185 F.Supp. 426, 438 (S.D. N.Y.1960), the trial court stated:

"If the Bank permitted a corporate officer or other fiduciary to withdraw funds from a corporate or other fiduciary account, and such funds were used for his own purposes with actual or constructive knowledge to the Bank that this would occur, the Bank would be liable for the loss suffered."

On appeal this decision was reversed (293 F.2d 889 (2d Cir. 1961)), but an extended discussion disclosed that recovery by the trustee in bankruptcy was not permitted of the funds taken from the corporate account and put in an officer's personal account because they were used for corporate purposes.

The 1881 case of National Bank v. Insurance Company, 104 U.S. 54, 26 L.Ed. 693, would indicate that the right of a bank to a lien is subject to the equity of an owner whose agent has misappropriated its funds, when the bank has knowledge of the owner's equity, either actual or constructive. The court said at page 71:

"* * * [T]he bank had full knowledge of the sources of the deposits made by Dillon in this account,

and of his duty to remit and account for them as agent of the insurance company. It is, consequently, chargeable with notice of the equities of the appellee."

The rule is stated in 9 C.J.S. Banks and Banking § 354, page 726, thus:

"However, the bank will be liable for losses resulting to such a payee for permitting its representative to deposit the check to his personal account, knowing that he is without authority. In fact, according to some authorities the bank must ascertain, at peril of liability to the corporation for losses, whether the authority of its representative to indorse checks payable to it, carries with it the authority to transfer the money to his personal account. * * *."

In 10 Am.Jur. 2d Ed. Banks § 494, p. 463, it is stated:

"In paying out a deposit account of a corporation, the bank must be satisfied that the officer withdrawing the deposit is authorized to do so; if it pays without question, it takes the risk of being held liable for the amount irregularly paid away."

Ibid., § 548, pp. 522–523:

"There is also authority to the effect that a bank which credits paper payable to a corporation to the personal account of a corporate officer having authority to indorse it, and pays out the proceeds on the latter's personal checks, acts at its peril to ascertain whether he has authority to indorse them and by his indorsement transfer the money to be paid thereon to his personal account. If he does not have such authority, the bank converts the corporation's property and is liable to it therefor. * * *."

In Atlanta & St. A. B. Ry. Co. v. Barnes, 96 F.2d 18, 19 (5th Cir. 1938), it was said:

" * * * The bank's liability reverts to the question of its good faith under all the circumstances known to it."

 The court is of the opinion that in the factual setting of this case that Schulman's being the sole stockholder—if he were—should not affect the conclusion as to the rights of the creditors of the corporation against the bank. It made the severe losses possible through its gross negligence and violation of the resolution on file.

The motion of plaintiff for summary judgment is, therefore, granted, and plaintiff is directed to prepare and submit a final decree within ten days.