In re SOUTHERN INDUSTRIAL
BANKING CORPORATION,
d/b/a Daveco, Debtor.

Thomas E. DUVOISIN, Liquidating Trustee of Plan and Creditors' Liquidation Trust, Southern Industrial Banking Corporation, Plaintiff,

v.

KENNERLY, MONTGOMERY, HOWARD & FINLEY, a General partnership; W.W. Kennerly, Lewis S. Howard, Robert A. Finley, C.A. Ridge, Jr., L. Anderson Galyon, III, Darryl G. Lowe, Thomas C. Cravens, III, Alexander M. Taylor, Jack M. Tallent, II, G. Wendell Thomas, Mary C. Montgomery, Executrix of the Estate of George D. Montgomery, Defendants.

Bankruptcy Nos. 3-83-00372, 3-85-0718.

United States Bankruptcy Court,
E.D. Tennessee.

May 11, 1989.

See also, Bkrtcy., 93 B.R. 605.

Gary R. Patrick, Michael E. Richardson, Steven M. Jacoway, Chattanooga, Tenn., Michael Davis, and Carolyn Frost, Knoxville, Tenn., for plaintiff.

W. Kyle Carpenter and H. Bruce Guyton, Knoxville, Tenn., for defendants.

## SUPPLEMENTAL MEMORANDUM OPINION

STEVEN W. RHODES, Bankruptcy Judge.

This adversary proceeding is before the Court for decision following trial. This decision constitutes the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Bankruptcy Rules and Rule 52 of the Federal Rules of Civil Procedure.[1]

---

1. This supplemental memorandum opinion supplements a decision given in court on April 27,

### I.

In this adversary proceeding, the plaintiff seeks to recover a fraudulent conveyance in the amount of $10,414,000 pursuant to 11 U.S.C. §§ 548 and 550. The plaintiff also seeks to recover a preference in the amount of $8,049,489.20 pursuant to 11 U.S.C. §§ 547(b) and 550. This is a core proceeding under 28 U.S.C. § 157(b).

More specifically, the plaintiff's claims are as follows:

On January 5, 1983, Southern Industrial Banking Corporation ("SIBC"), while insolvent, transferred $10,414,000 to the defendant law firm, Kennerly, Montgomery, Howard & Finley ("KMHF"), in exchange for worthless notes from C.H. Butcher Jr. ("Butcher"), who was the chairman of the board of SIBC. The plaintiff contends that this transfer was a fraudulent transfer under 11 U.S.C. § 548(a)(2), and that KMHF is liable for that transfer under section 550(a) of the Bankruptcy Code as a transferee.

On January 6, 1983, KMHF purchased an investment certificate from SIBC in the amount of $8,000,000. On January 31, 1983, this investment certificate was redeemed in the amount of $8,049,489.20. The plaintiff claims that this redemption was a transfer of an interest of SIBC in property for the benefit of a creditor (KMHF) on account of the antecedent debt evidenced by the investment certificate, and that the transfer was made while SIBC was insolvent, within 90 days before SIBC's bankruptcy on March 10, 1983. The plaintiff also claims that this redemption allowed KMHF to receive more that it would have received if the case were in Chapter 7 and the transfer had not been made. Again, the plaintiff claims that the defendants are liable for this preference under section 550(a) as a transferee.

The defendants are the law firm KMHF and its several partners. They deny all liability and claim that KMHF acted only as an escrow agent for Butcher in these transactions and therefore are not liable as

1989.

transferees under section 550(a). The defendants further assert that although KMHF had represented SIBC in other transactions, the firm did not represent SIBC in connection with the escrow transaction at issue, and that SIBC was not a party to the escrow agreement. Therefore, the defendants claim that the firm owed no duties to SIBC in these transactions, either as attorneys or as an escrow agent. The defendants further deny any knowledge of the source of escrowed funds or of SIBC's financial difficulties. The firm denies any bad faith, negligence, breach of duty, or conflict of interest.

Finally, the defendants claim that SIBC did receive reasonably equivalent value for the $10.4 million transfer on January 5, 1983, and the defendants question whether SIBC was in fact insolvent on that date.

The plaintiff responds that because of the close, long-standing relationships among KMHF, Butcher and SIBC, and because of the conduct of KMHF both in connection with the escrow transaction and in connection with several prior transactions of SIBC in 1979 and 1981, KMHF should be held liable as a transferee of both the preference and the fraudulent conveyance.

Accordingly, the Court concludes that there is one primary legal issue and several factual issues to be resolved. The legal issue is whether an escrow agent is liable as a transferee under section 550 of the Bankruptcy Code, and if so, under what circumstances. The factual issues are:

First, did SIBC receive reasonably equivalent value for the $10.4 million it transferred on January 5, 1983?

Second, was SIBC insolvent when it made the transfers at issue?

Third, was the conduct of KMHF in connection with these transactions such that KMHF should be held liable as a transferee under section 550(a)?

## II.

More specifically, the circumstances leading to the escrow account transactions at issue are as follows:

SIBC was organized in 1929 as an industrial loan and thrift. It raised money by selling investment certificates to the public. It then loaned this money at a higher interest rate, historically to consumers, but more recently also to commercial clients as a result of usury laws changes. Butcher, along with David Crabtree, another substantial stockholder, effectively controlled SIBC beginning in about 1972.

In the fall of 1982, Butcher began to pursue an intention to acquire two savings and loan associations in Florida. As of that time, Butcher owned numerous banks in east Tennessee and in Kentucky, as well as a substantial portion of the stock of SIBC.

In September of 1982, Butcher signed agreements to acquire the stock of Home Federal Savings & Loan of Palm Beach, Florida and Chase Federal of Miami, for a total purchase price of $50 million, consisting of $25 million in cash, $11 million in a letter of credit and $16 million in a building called the UAB Plaza Building.

Nothing in the acquisition agreements that Butcher entered into for the purchase of the two Florida savings and loans required any escrow deposit, but Butcher decided to do so anyway to demonstrate to all concerned his ability to fund the acquisitions. Butcher and KMHF entered into a specific written escrow agreement (Exhibit 35) setting forth the rights and duties of Butcher and KMHF in regard to the escrow account. There was also a third signatory to the escrow agreement—Butcher–Tennessee Investment Corp. ("BTIC"), which Butcher caused to be formed as a holding company to acquire and hold the stock of the two Florida savings and loans.

The escrow agreement provided that Butcher and BTIC would deposit and KMHF would hold $25 million for the purpose of funding the stock acquisition of the two Florida savings and loans. The cash in the escrow was to be invested by KMHF pursuant to the joint written directions of BTIC and Butcher. The agreement further provided that if the escrowed funds were not used to acquire the savings and loan stock, then KMHF would pay out the funds

pursuant to the joint written directions of BTIC and Butcher.

Butcher arranged for SIBC to fund $10.4 million of the $25 million cash requirement. Thus, on January 5, 1983, SIBC issued three checks to C.H. Butcher, Jr. for $5,910,000, $500,000, and $4,004,000, for a total of $10,414,000 (Exhibit 44). Butcher authorized Crabtree to sign his endorsement of these checks to the KMHF escrow account. Initially, these checks were deposited to the KMHF client trust account and commingled with other client funds. Later the funds were withdrawn and deposited to a special escrow account that KMHF established exclusively for this fund.

In consideration for those transfers, SIBC acquired notes from Butcher, who arranged them from three sources—first, the C & C Plaza Limited Partnerships; second, the Investors Associates and Equity Investors Limited Partnerships; and third, the Syndicate Cable Investment Trust.

As noted earlier, the value of those notes is a primary fact issue in connection with the plaintiff's fraudulent conveyance claim.

Pursuant to instructions from Butcher, $8 million from the escrowed funds was used to purchase an investment certificate from SIBC on January 6, 1983.

After Butcher's proposed acquisition of the two Florida savings and loans fell apart, this investment certificate was redeemed as follows:

SIBC issued a check in the amount $2,545,101.60 to KMHF, which Lewis Howard, a partner in KMHF, then endorsed to Tennesco, pursuant to instructions from Butcher. Tennesco was a bank service business that was owned by David Crabtree, and to whom Butcher owed money. The balance of $5,504,384.60 was paid by SIBC's transfer to Butcher of certain notes that it held in that approximate face value. Butcher himself was the promissor on certain of these notes, the transfer of which therefore had the effect of cancelling his obligations. In any event, SIBC's redemption of this $8 million investment certificate forms the basis of the plaintiff's preference claim.

## III.

As noted, the first issue is whether the notes that SIBC received were worth the reasonable equivalent of $10.4 million, which was the amount SIBC paid for the notes. Determination of this issue requires an analysis of each of the three separate groups of notes: the Investors Associates and the Equity Investors Limited Partnerships notes, the C & C Plaza Limited Partnerships notes, and the Syndicate Cable Investment Trust note.

## A.

█ The Syndicate Cable Investment Trust ("SCIT") was formed by Howard at the request of Butcher. Howard was the trustee. The trust agreement (Exhibit 39) was actually executed in January of 1983, but was backdated to January 1, 1982. Its sole purpose was to buy assets from Butcher in exchange for notes that he could discount or assign to financial institutions in an effort to raise the $25 million necessary to purchase the two Florida savings and loans.

Exhibit 40 is a note signed by Howard as trustee for SCIT's purchase of a quarter horse named Sonny Dee Barr, in the amount of $500,000. It was dated July 15, 1982, but it was actually signed in January, 1983. This note was subsequently endorsed to SIBC in partial consideration for the $10.4 million that SIBC transferred to the KMHF escrow account. The note was secured by a second lien on the horse; the first lien was $729,000.

Although there was no direct, expert testimony of the value of the horse at that time, other evidence suggests that it was worth approximately $1 million. That was what Butcher had paid for it one year earlier, and that was the value estimated by the FDIC (Exhibit 79).

At one point, Butcher testified that at the time SCIT purchased the horse he felt the horse was worth $1.5 million, but later he testified that he did not know what it was worth. Plainly, Butcher assigned a $1.5 million value to the horse at the time

because he needed the money. But there was no support for such a value. Nothing indicated that the horse would have appreciated $500,000 in the short time Butcher owned it. Rather, it appears that Butcher decided to raise the price from the $1 million he paid up to $1.5 million, to cover the $500,000 note.

In an exhaustive examination of SIBC in April of 1983, the FDIC investigated this transaction in detail. As noted, the FDIC estimated that the horse was worth $1 million. It concluded that the advancing age of the horse would only have an adverse affect upon its value. Accordingly, the best evidence suggests the horse was worth $1 million.

This analysis might suggest that the SCIT note would have a value of $300,000, which is the net of the $1 million collateral value after the $700,000 first mortgage. But other factors indicate that the SCIT note in fact had no substantial commercial value. First, according to SCIT's financial statements (Exhibit 45), SCIT had a negative net worth of $245,000. Those financial statements, as well as the testimony of Butcher, Crabtree and Howard, suggest that SCIT had no income and thus no way to pay the note. Second, Howard concluded that the note had no commercial value. Third, the FDIC classified the note as a loss. Accordingly, the Court concludes that SIBC did not receive $500,000 in value when it received the $500,000 SCIT note in exchange for $500,000 in cash.

## B.

The second group of notes that SIBC received on January 5, 1983 was a group of notes from fourteen limited partnerships called the Investors Associates Limited Partnerships and the Equity Investors Limited Partnerships. Each of these fourteen limited partnerships gave a promissory note in the amount of $286,000 to purchase Butcher's interest in the First and Farmers Bank in Somerset, Kentucky. Thus, the total purchase price was $4,004,000. Butcher valued his stock in that bank at $7 million and it was subject to a first lien in favor of the First National Bank of Louisville. That lien was $1.4 million according to Butcher or $2.8 million according to Crabtree. Either way, it appeared that there was a minimum of $4 million equity available.

Nevertheless, the FDIC determined that one of the fourteen notes was of substandard quality, that two others were doubtful, and that seven were loss. The FDIC report states that the other four of the fourteen notes had been purchased by Butcher, although it is not clear whether these four are among the notes that Butcher took in redemption of the $8 million investment certificate.

The FDIC reached its conclusion for two reasons. First, although the notes were collateralized by an assignment of the Kentucky bank stock sale contract, that contract had a number of provisions that substantially weakened the value of the contract as collateral.

The second reason that the FDIC concluded that the notes were of little value was because, given the lack of collateral value, the value of the notes depended on the financial position of the various general partners. Again, the FDIC examined this in detail, and, as a result, classified most of the loans as doubtful and loss. The FDIC analysis of these notes is uncontroverted in the evidence and it appears to reflect an exhaustive study from a neutral perspective. Accordingly, the Court accepts it.

Finally, the Court notes that Butcher and Crabtree both testified that Crabtree forged several of the general partners' signatures on these notes. This factor alone would substantially undermine the value of these notes. In addition, the evidence reflects that nothing has ever been collected on these notes.

In sum, the Court finds that the fourteen Investors Associates and Equity Investors limited partnership notes that SIBC received in exchange for the $4,004,000 check were not worth $4 million, and were most likely worthless.

## C.

The third group of notes that SIBC received on January 5, 1983, was a group of

notes totalling $6.4 million in face value from a group of limited partnerships called the C & C Plaza Limited Partnerships. Butcher received these notes in exchange for his interest in the C & C Plaza Building, then in the early phase of construction. SIBC transferred $5,910,000 to Butcher, in exchange for these notes, which were secured by an assignment of 50% of the profits and capital interest in the property.

Crabtree and Butcher went to some effort to determine that Butcher's equity in the property was $12 million. Thus, again it appeared that these notes were worth full value. And indeed, SIBC immediately participated out, on a non-recourse basis, $4.6 million of the $6.4 million in face value. Thus, the face value of the C & C Plaza notes retained by SIBC was only $1.8 million.

Again, after a detailed analysis, the FDIC classified these notes as loss, for essentially the same reasons that it so classified the Investors Associates and Equity Investors notes; there was no real value to the collateral and the general partners were uncollectible. As the FDIC stated, the equity value of $12 million determined by Butcher and Crabtree must have depended upon numerous assumptions regarding the time and expense of completion, the income and expenses of operations, and the tax consequences of the deal, because at that time there was no building and therefore no operational experience. Although Butcher and Crabtree felt confident about their valuation of the equity, that confidence does not persuade the Court, given the motives of Butcher and Crabtree at the time and given the later FDIC analysis.

Two final points must seal this issue. The C & C Plaza notes were payable to Butcher, who first endorsed them not to SIBC directly but rather to BTIC. There was a second endorsement by BTIC to SIBC, apparently executed by Ralph Newman, a CPA and advisor to Butcher who was the president of BTIC. But according to Newman, these endorsement signatures are all forgeries. And again, the only

amount collected on any of these notes has been $95,000 as a result of litigation.

Accordingly, the Court finds that SIBC did not receive reasonably equivalent value for the C & C notes it purchased.

In sum then, the Court finds that SIBC did not receive property worth the reasonable equivalent of $10.4 million for the cash in that amount that it transferred to the KMHF escrow account.

### IV.

The next fact issue is whether SIBC was insolvent in January of 1983 when these transactions occurred. It is fair to say that the only evidence of solvency came from Butcher and Crabtree, who indicated in a general way that they thought that SIBC was solvent. They concluded that SIBC failed not because it was insolvent, but because the United American Bank was closed on February 13 or 14, 1983. In their view, the resulting public concern caused a run by SIBC's investment certificate holders.

However, substantial evidence of SIBC's insolvency is found in the FDIC examination report as well as in the testimony from the plaintiff's expert, Ray Moody, a CPA with Peat Marwick. The FDIC found that SIBC was insolvent by $22 million in April of 1983. Moody found that by the simple but necessary process of restating the two 1981 sale-lease back transactions that SIBC had improperly presented in its financial statements, SIBC was insolvent by several hundred thousand dollars in January of 1983. In the circumstances, and without going into detail, the Court concludes that the evidence of insolvency from the FDIC and from Moody is entitled to substantially greater weight than the evidence of solvency from Butcher and Crabtree. Accordingly, the Court finds that SIBC was insolvent during January of 1983.

### V.

At this point, it is appropriate to conclude that the plaintiff has established all of the elements of a fraudulent transfer under section 548(a) of the Bankruptcy Code. This section provides:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

. . . .

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation. . . .

As earlier found, SIBC made these transfers totalling $10.4 million in cash for less than reasonably equivalent value, while it was insolvent. Thus, the transfers are voidable under section 548(a).

This is certainly true with respect to the $500,000 check transferred to KMHF for the SCIT note and the $4 million check for the Investors Associates and Equity Investors notes. An issue arises, however, as to the treatment of the $5.9 million check for the C & C Plaza notes, because SIBC concurrently received $4.6 million in cash from non-recourse participations. After these participations, SIBC was left with $1.3 million in C & C Plaza notes. The plaintiff contends that because SIBC received these funds on account of participations on the notes, rather than through payments on the notes, the entire transfer was fraudulent and voidable.

However, the Court rejects the plaintiff's position under either of two theories. Under the first theory, the C & C Plaza transaction could be viewed as two contemporaneous transactions. In the first, SIBC paid $4.6 million in cash for $4.6 million in notes and then immediately sold those notes for $4.6 million, with no resulting gain or loss. In the second transaction, SIBC paid $1.3 million for notes of face value $1.8 million which had no actual value, resulting in a $1.3 million loss.

Of course the first transaction did not result in a fraudulent conveyance because SIBC received reasonably equivalent value for its cash; it is thus not voidable by the plaintiff under section 548(a). The second transaction would result in a fraudulent transfer because SIBC transferred $1.3 million for notes of no value; thus the transfer of $1.3 million would be voidable. Therefore, the two contemporaneous transactions are voidable only to the extent of $1.3 million.

The other theory will lead to the same result. Even if it is concluded that this transaction was in reality only one transaction, rather than two separate ones, it must be noted that Butcher structured it in advance such that the $4.6 million non-recourse participations were an integral, contemporaneous part of the transaction. Stated another way, it would defy reality to conclude that SIBC received nothing in exchange for the $5.9 million it paid for the C & C Plaza notes; in fact, it received $4.6 million. Stated yet another way, it would be unfair and improper to grant SIBC's trustee a judgment for the recovery of the $5.9 million expended for these notes when SIBC has already received $4.6 million for some of the same notes.

The point is that whether SIBC received payments on the notes totalling $4.6 million or participations in that amount, it only lost $1.3 million. Thus, if a judgment is to be entered in the plaintiff's favor on his fraudulent transfer claim, it will be for $500,000 on the check for the SCIT note; plus $4,004,000 on the check for the Investors Associates and Equity Investors notes; plus $1,310,000 on the check for the C & C Plaza notes; for a total of $5,814,000.

### VI.

■ At this point, it is also appropriate to conclude that the plaintiff has established all of the elements of a voidable preference under section 547(b) of the Bankruptcy Code. That section provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; ... and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

SIBC's redemption of the $8 million investment certificate was to or for the benefit of a creditor, on account of antecedent insolvent. It also allowed KMHF and Butcher to receive more than they would have if SIBC were in chapter 7 and the transfer had not been made. SIBC's transfer of $8,049,486.20, including interest, in redemption of the investment certificate is thus a voidable preference under section 547(b) of the Bankruptcy Code.

## VII.

As noted earlier, the primary legal issue in this adversary proceeding arises from the application of section 550(a) of the Bankruptcy Code. That section provides:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

### A.

An initial transferee is one who has received property directly from the debtor. *See 4 Collier on Bankruptcy* § 550.01 (15th ed. 1985). Accordingly, KMHF must be considered either an initial transferee or an immediate transferee at least with respect to the funds subject to the fraudulent transfer previously found, and at least with respect to the $2.5 million portion of the voidable preference that KMHF received from SIBC in the form of a check. A preliminary issue arises however regarding whether KMHF should be considered a transferee of the $5.5 million in notes that SIBC transferred directly to Butcher as the second part of the voidable preference. The evidence reflects that KMHF never had those notes. Thus, KMHF argues that it is not a transferee of that property, and therefore not liable.

Careful analysis of sections 547(b) and 550(a) indicates that the defendants' argument must be rejected. Under section 547(b)(1), a transfer need not be made directly to a creditor in order to be a preference; a transfer for the benefit of a creditor is likewise voidable. *See 4 Collier on Bankruptcy* § 547.04 (15th ed. 1985). *See, e.g., In re Checkmate Stereo & Electronic Ltd.,* 21 B.R. 402, 411 (E.D.N.Y.1982). Similarly, recovery under section 550(a) is not limited to transferees, whether initial, immediate or mediate; under section 550(a)(1), recovery is permitted against the entity for whose benefit the transfer was made.

In the present case, Butcher was no doubt the initial transferee of the $5.5 million in notes because he received them directly from SIBC. However, the evidence fully establishes that SIBC's debt on the investment certificate was owed to KMHF, not to Butcher, and that when SIBC transferred the notes to Butcher, SIBC did so in redemption of KMHF's investment certificate and credited KMHF's investment certificate account. Therefore, the transfer was for the benefit of the creditor KMHF, within the meaning of section 547(b)(1). Likewise, in the language of section 550(a)(1), KMHF was "the entity for whose

benefit the transfer was made." Therefore, under a literal reading of section 550(a), the trustee may recover the value of the notes from KMHF.

Accordingly, the Court concludes that KMHF would be liable for the fraudulent transfer and the preference under a literal reading of section 550(a)(1) of the Bankruptcy Code.

### B.

However, KMHF contends that because it acted as an escrow agent, it acted as a mere conduit of the transfers from SIBC to Butcher. It therefore contends that it should not be held to a literal interpretation of this section. In support, KMHF has cited several cases in which courts have denied recovery against transferees on equitable grounds.

In *Gropper v. Unitrac (In re Fabric Buys of Jericho, Inc.)*, 33 B.R. 334 (Bankr. S.D.N.Y.1983), the defendant law firm had represented Unitrac in negotiating the settlement of an earlier lawsuit between the debtor and Unitrac several months prior to the debtor's chapter 11 filing. The debtor gave the law firm a check payable to Unitrac and a partner in the law firm. The check was deposited in the law firm's escrow account; another check for the same amount was later drawn on the escrow account and paid to Unitrac. The trustee in bankruptcy subsequently sought to recover the amount of the check from the law firm as an initial transferee of an avoidable preference under section 550. The court concluded that the law firm had not had direct contact with the debtor, and that it was "a mere conduit of funds from Fabric Buys to Unitrac." *Id.* at 337. Instead, the court found that "Unitrac had the direct business dealings with Fabric Buys that gave rise to the debt, subsequent suit, and the allegedly preferential payment." *Id.* Accordingly, the court refused to hold the law firm liable for the transfer. *Id.*

The rational of the court in *In re Fabric Buys* was essentially equitable. The court quoted 4 *Collier on Bankruptcy* § 550.02 (15th ed. 1983):

In some circumstances, a literal application of section 550(a) would permit the Trustee to recover from a party who is innocent of wrongdoing and deserves protection. In such circumstances the bankruptcy court should exercise its discretion to use its equitable powers under section 105(a) and 28 U.S.C. § 1481 to prevent an inequitable result.

33 B.R. at 337. The reasoning of *In re Fabric Buys* has been applied in several subsequent cases.

In *In re Moskowitz*, 85 B.R. 8 (E.D.N.Y. 1988), a bankruptcy trustee sought to recover money deposited with a title company to clear the title to the debtor's house prior to its sale. The debtors had contracted to sell their home without petitioning the bankruptcy court for its approval, and neither the purchasers nor the title company had knowledge of the bankruptcy. Relying on *In re Fabric Buys*, the district court held that the bankruptcy court should not have characterized the title company as an initial transferee. 85 B.R. at 11. The court further noted, in the alternative, that "this was a case where the Bankruptcy Court should have exercised its powers of equity to refuse to allow recovery from the Title Company." *Id.* In explanation, the court stated:

> Here, payments were made without knowledge of the bankruptcy to parties who would have, in any event, been entitled to priority. With the exception of the payment by the purchasers of the insurance premium, the Title Company did not benefit from the transfer and the record does not indicate that the Title Company earned anything from the money for the short period of time that the money was in its possession. The Title Company merely facilitated the non-voidable closing of a sale of real estate to bona fide purchasers.

*Id.*

Other courts have also relied on *In re Fabric Buys* as a basis for refusing to apply section 550 to parties who would otherwise be liable for preferential transfers as transferees. In *Metsch v. First Alabama Bank of Mobile (In re Colum-*

*bian Coffee Co., Inc.)*, 75 B.R. 177 (S.D.Fla. 1987), a bank which accepted wire transfers from the debtor for transfer to an account of a creditor of the debtor was held not to be an initial transferee. In *Jet Florida, Inc. v. Airlines Clearing House, Inc. (In re Jet Florida System, Inc.)*, 69 B.R. 83 (Bankr.S.D.Fla.1987), an organization which facilitated interairline settlement of accounts was held not to be an initial transferee. In *Ducker v. Fairmeadows II (In re Bridges Enterprises, Inc.)*, 62 B.R. 300 (Bankr.S.D.Ohio 1986), attorneys who transferred settlement funds between the debtor and the plaintiff in a lawsuit were held to be transferees but the court concluded that to find them to be initial transferees would be "too literal a reading of the Bankruptcy Code." 62 B.R. at 303. In *Salomon v. Nedlloyd, Inc. (In re Black & Geddes, Inc.)*, 59 B.R. 873 (Bankr.S.D.N.Y. 1986), a steamship agent which accepted a transfer from the debtor on behalf of a common carrier acted as a mere conduit of funds and was not an initial transferee within the ambit of section 550.

In *Brinig v. American Credit Bureau, Inc.*, 439 F.2d 43 (9th Cir.1971), a collection agency acted as a mere intermediary between the debtor and its creditors and was not liable for a transfer that it had already passed on to a creditor.

### C.

On the other hand, there have been several cases in which the defendants' assertions that they should not be treated as transferees on equitable grounds have been rejected.

In *Maley v. East Side Bank of Chicago*, 234 F.Supp. 395 (N.D.Ill.1964), a trustee in bankruptcy sought to recover from a bank the amount of checks payable to the debtor but which were cashed by the debtor's sole stockholder. The evidence in that case revealed that the debtor, which had previously had a good rating with Dun & Bradstreet and the defendant bank, was purchased by Schulman. Within two weeks of acquiring the debtor, Schulman used the debtor's good credit rating to purchase $66,757.37 worth of materials, which he immediately resold. Although the checks he received in payment for the materials were payable to the debtor, the bank cashed the checks and paid the cash to Schulman. Ten checks, ranging in value from $100 to $9,900 were cashed and paid to Schulman within a two week period.

The court found that the circumstances surrounding these transactions were "exceptional and suspicious...." *Id.* at 397. The court noted, "A bank normally does not permit corporate funds to be diverted to individuals; it does not, in a short interval, repeatedly pay large sums in cash; it does not suddenly receive constantly recurring credit inquiries." *Id.* The court found that the bank's actions violated the bank's own resolution governing its dealings with corporate depositors and constituted gross negligence. The court concluded that the bank was "the effective instrumentality in the [fraudulent] transfer of the bankrupt's funds, when it received a check made payable to the *Company*, cashed the same and knowingly and with gross negligence gave the cash to someone other than the Company." *Id.* at 398. Therefore, the bank was held liable to the debtor's creditors for the amounts paid over to Schulman.

*McNeill v. Sideman*, 377 F.Supp. 792 (E.D.Wis.1974), involved an action by a bankruptcy trustee to recover partnership money transferred to an employee of the partnership in order to avoid garnishment of the partnership's bank account. The employee then distributed some of the funds back to individual partners for their individual use. The court concluded, "The evidence shows that [the employee, who was a son-in-law of one of the partners,] was the effective instrumentality in the transfer of the partnership funds who knew or should have known of the financial difficulties of that entity and who, as trustee of the funds while they were in his bank account, violated his obligation to the partnership by the fraudulent transfer to the individual partners. Under these circumstances ... vis a vis the creditors of the bankrupt partnership, [the employee] is lia-

ble for restoration of the fraudulently transferred money...." *Id.* at 794.

In *Jones v. J.E.G. Enterprises, Inc. (In re Greenbrook Carpet Co., Inc.)*, 22 B.R. 86 (Bankr.N.D.Ga.1982), the court held that a bank was not a good faith transferee of preference payments to a parent corporation from its subsidiary because of its knowledge of the debtor-subsidiary's insolvency and awareness of the close dependent relationship of the parent company to the subsidiary. In that case, the bank had a normal business practice of obtaining the financial reports of its corporate debtors. Although the annual report of the debtor showed significant losses, the bank continued to process transfers between the debtor-subsidiary and its parent corporation. The court found that the bank's handling of the transactions was not done in good faith:

"The term, 'good faith' does not merely mean the opposite of the phrase 'actual intent to defraud.' That is to say, an absence of fraudulent intent does not mean that the transaction was necessarily entered into in good faith. The lack of good faith imports a failure to deal honestly, fairly and openly." Good faith may be lacking because of a transferee's knowledge of a transferor's unfavorable financial condition at the time of the transfer or because of a transferee's position as an insider with control over the corporation's finances.

In the context of this case, [the bank's] knowledge of insolvency from its review of the financial statement of [the subsidiary] creates the inference of bad faith. *Id.* at 90–91 (citations omitted). As a result, the court held that the bank was liable for the amount of the transfers. *Id.* at 92.

Another case in which the good faith defense was rejected is *Barr v. Weber (In re Carousel Candy Co., Inc.)*, 38 B.R. 927 (Bankr.E.D.N.Y.1984). In that case, the defendants were two attorneys who had represented the debtor. The evidence showed that, within one year prior to bankruptcy and while the debtor was insolvent, the attorneys sold most of the debtor's assets. The debtor received none of the proceeds of these transfers. Instead, the monies were retained by the attorneys or paid to or on behalf of the sole stockholder of the debtor and a favored creditor. *Id.* at 936. The court stated, "The bad faith of the defendants in this case is demonstrated by the manner in which the money was disposed of." *Id.* at 937.

The court noted that the attorneys "were in the best possible position to know exactly what condition their client was in...." *Id.* Further, they had "a fiduciary obligation to the debtor to protect its assets against raids by or on behalf of its insiders, and to preserve the corporate integrity for the benefit of its creditors." *Id.* at 938 (citations omitted). The court found that the attorneys had breached that duty, and "proceeded to take full advantage of their knowledge for their own benefit." *Id.* at 937. Accordingly, court found the attorneys liable as transferees of the debtor's assets. *Id.* at 938–39.

In *Huffman v. Commerce Security Corp. (In re Harbour)*, 845 F.2d 1254 (4th Cir.1988), the debtor transferred $179,450 to a friend through the friend's mother. The mother admitted that she never questioned these transfers and claimed to have been entirely ignorant of the reasons behind the financial maneuverings of the debtor and her son. The court concluded that the mother should be held liable as an initial transferee under section 550(a)(1), stating, "Even assuming that she did not know and did not ask why these funds were being processed through her, such wilful ignorance in the face of facts which cried out for investigation may not support a finding of good faith on her part." *Id.* at 1258.

The court further stated, "A purely literal reading of section 550(a)(1), however, appears to be an interpretation that is too narrow to fit all circumstances." *Id.* at 1256. The court reviewed the *Fabric Buys* and *Black & Geddes* cases, along with *Metsch v. First Alabama Bank of Mobile (In re Columbian Coffee Co., Inc.)*, 59 B.R. 643 (Bankr.S.D.Fla.1986), *aff'd*, 75 B.R. 177 (S.D.Fla.1987), and concluded that

those cases were distinguishable. 845 F.2d at 1256–57. The court also stated:

> Although we do not wish to declare that a "mere conduit" exception to section 550(a)(1) should apply only to commercial entities, we do recognize that the likelihood of bad faith on the defendant's part is lessened where the defendant is a commercial enterprise handling transactions in a routine fashion.... It is noteworthy that the court in *Fabric Buys* opined that the question of "good faith" is irrelevant to a consideration of whether a party is an "initial transferee" under section 550(a)(1). But if a defendant who is the initial recipient of funds asks the court on essentially equitable grounds to declare that the defendant is not an "initial transferee" under section 550(a)(1), then clearly this defendant must not have acted inequitably, *i.e.*, in bad faith.

*Id.* at 1257 (citation omitted).

### D.

■ The general rule that these cases support is that recovery under section 550(a) is properly denied if the defendant establishes that in the transactions at issue, it acted as a conduit and in good faith. In determining whether the defendant acted in good faith, all of the circumstances of the transaction must be examined. Although there are no doubt many factors that should be considered in other contexts, the Court concludes that the following factors, some of which are suggested in the prior cases, should be considered in determining the defendants' good faith in this case:

First, were the transactions at issue within the ordinary course of the defendants' business? If so, the defendant more likely acted in good faith. In *Gropper v. Unitrac (In re Fabric Buys of Jericho, Inc.)*, *In re Moskowitz*, and the other cases denying recovery, the transactions at issue were ordinary business transactions for the defendants. On the other hand, in *Maley v. East Side Bank of Chicago*, *McNeill v. Sideman*, and *Huffman v. Commerce Security Corp. (In re Harbour)*, the good faith defenses were rejected, in part because the transactions were not in the ordinary course of the defendants' businesses.

Second, what was the nature and extent of the defendant's relationship with the debtor? If the defendant had an established or insider relationship with the debtor, the defendant's good faith is less likely. Again, in *In re Fabric Buys* and *In re Moskowitz*, the defendants had no established relationships with the debtors. But in *In re Harbour* and *In re Carousel Candy*, there were close relationships, and the defenses were rejected.

Third, what did the defendant know or what should the defendant have known about the effect that the transactions at issue would have on the debtor and its creditors? If the defendant knew or should have known that the transaction would have an adverse effect on the debtor and its creditors, good faith will be difficult to show. *See Barr v. Weber (In re Carousel Candy Co., Inc.)*, 38 B.R. 927 (Bankr. E.D.N.Y.1984); *Jones v. J.E.G. Enterprises, Inc. (In re Greenbrook Carpet Co., Inc.)*, 22 B.R. 86 (Bankr.N.D.Ga.1982). Sub-issues here might include:

(A) Was the transaction in the ordinary course of the debtor's business? If it was not, then there is a greater likelihood of an adverse effect on creditors, and the defendant should probably exercise greater care. *See Huffman v. Commerce Security Corp. (In re Harbour)*, 845 F.2d 1254 (4th Cir.1988); *McNeill v. Sideman*, 377 F.Supp. 792 (E.D.Wis.1974); *Maley v. East Side Bank of Chicago*, 234 F.Supp. 395 (N.D.Ill.1964); *Barr v. Weber (In re Carousel Candy Co., Inc.)*, 38 B.R. 927 (Bankr. E.D.N.Y.1984).

(B) What information was available to the defendant regarding the debtor's insolvency? If information was available indicating insolvency, it would be less likely that the defendant acted in good faith. *See McNeill v. Sideman*, 377 F.Supp. 792 (E.D. Wis.1974); *In re Moskowitz*, 85 B.R. 8 (E.D.N.Y.1988); *Jones v. J.E.G. Enterprises, Inc. (In re Greenbrook Carpet Co., Inc.)*, 22 B.R. 86 (Bankr.N.D.Ga.1982).

Fourth, did the defendant violate any legal or professional ethical duties in the

transaction at issue? If so, good faith will be more difficult to establish. *See McNeill v. Sideman*, 377 F.Supp. 792 (E.D.Wis. 1974); *Barr v. Weber (In re Carousel Candy Co., Inc.)*, 38 B.R. 927 (Bankr.E.D.N.Y. 1984).

Fifth, did the defendant improperly retain any of the property or otherwise benefit from the transactions at issue? *See Barr v. Weber (In re Carousel Candy Co., Inc.)*, 38 B.R. 927 (Bankr.E.D.N.Y.1984). Here it must be recognized that receiving or retaining reasonable fees for services rendered does not indicate bad faith.

Sixth, did the defendant participate in the transaction with an honest and innocent intention? *See Huffman v. Commerce Security Corp. (In re Harbour)*, 845 F.2d 1254 (4th Cir.1988); *Barr v. Weber (In re Carousel Candy Co., Inc.)*, 38 B.R. 927 (Bankr.E.D.N.Y.1984).

### E.

█ It is now left to examine this list of factors in the context of the present case, for the ultimate purpose of determining whether the defendants have met their burden of establishing their good faith in these transactions.

### (1)

First, it is reasonably clear, and the Court finds, that the escrow transaction was within the ordinary course of the business of KMHF. Attorneys regularly and ordinarily hold money for their clients for various purposes, and this escrow transaction was only a sub-species of such a transaction. The Court concludes that the size of the fund on account, $25 million, did not by itself take it out of the ordinary course of business. Accordingly, this factor by itself does not suggest bad faith.

### (2)

Second, although it was clear that KMHF had no specific relationship with SIBC in connection with the escrow transaction, if only because SIBC was not a party to it, it was equally clear that KMHF had an ongoing attorney-client relationship with SIBC at the critical times. Moreover, Howard had enjoyed a close personal and business relationship with Butcher for many years, and Howard was the trustee of the C.H. Butcher III Trust, a trust with substantial assets for the benefit of Butcher's son. These factors by themselves do not suggest bad faith, but they do provide the context for examining some of the other issues.

### (3)

The third issue is whether KMHF knew that the transactions would have an adverse impact on SIBC's creditors. As noted, in examining this issue, the Court will first determine whether the transactions were in the ordinary course of SIBC's business. It must be held that neither SIBC's transfer of $10.4 million to KMHF in exchange for notes from Butcher (the fraudulent transfer), nor SIBC's redemption of the $8 million investment certificate by paying cash and transferring notes (the preference) were in the ordinary course of SIBC's business. There was simply no evidence indicating that these were the types of transfers in which SIBC regularly or ordinarily engaged. Although SIBC may have on occasion, as part of its business, purchased notes from other financial institutions, nothing suggests that such purchases from insiders was an ordinary part of its business. Similarly, although SIBC regularly redeemed investment certificates, nothing suggests that it regularly did so by transferring noncash assets such as notes, or by delivering blank checks to its creditors, without cancelling the investment certificate. These were not transactions in the ordinary course of SIBC's business.

The other issue which must be examined in determining whether KMHF knew that the transactions would have an adverse effect on SIBC and its creditors is what information was available to KMHF regarding SIBC's insolvency. The record reflects that Howard was advised as early as mid–1979 that SIBC was experiencing financial difficulties. Butcher explained as much to Howard, and asked him to incorporate the Financial Services Leasing Corporation ("FSLC"). In the fall of 1979, FSLC and SIBC entered into a sale-lease back transaction in which SIBC sold its furniture

and certain charge off loans to FSLC in exchange for a note of $870,000, which represented at a mark up of $150,000. SIBC then leased its furniture back for $12,500 a month.

The net result was that SIBC appeared to make a large profit on the sale of capital assets and on loans that would otherwise have been charged off, but it then had to pay an excessive rent to FSLC. Howard and his firm were involved in these transactions, and knew they were undertaken only to correct SIBC's deteriorating financial condition and financial statements.

At about the same time in 1979, SIBC received a series of letters from the State of Tennessee, which reflected serious concerns about SIBC's losses in 1978 (Exhibits 8–9–10). Howard responded to these letters on behalf of SIBC. These letters, plus Howard's receipt of SIBC's monthly financial statements, indicate that Howard was well aware of SIBC's financial problems at that time.

In late 1981, SIBC was again showing substantial losses, and Butcher and Crabtree were concerned that this would adversely affect business. Thus, there was a meeting on October 9, 1981, attended by Butcher, Crabtree, and C.A. Ridge, another KMHF partner. Butcher and Crabtree also recall Howard's presence, but neither Howard nor Ridge recall that. In any event, several proposals to recapitalize SIBC were discussed and then summarized by Ridge in a memo (Exhibit 12 and 13). The plain motive for this meeting and for the discussions regarding the recapitalization of SIBC was SIBC's financial trouble, and this must have been abundantly clear to both Ridge and Howard. Even if Howard did not attend the October meeting (an issue which will be addressed later), he was no doubt apprised of those developments, and his time records reflect that he performed substantial legal services in connection with SIBC's restructuring in 1981.

In any event, three transactions resulted, all of which integrally involved KMHF. The first was a sale-lease back transaction that involved property called the Merchants Road property. SIBC sold this property to West Knox Investments ("WKI"), a company owned by Crabtree. The price of the property was intentionally inflated by $500,000 by means of a false appraisal, for the purpose of reporting a gain by year end. Concurrently, SIBC leased it back from WKI at an excessive rent. SIBC received only an unsecured note from WKI for this property. In fact, WKI then used the property as collateral for a loan of $500,000 from another Butcher bank and used that money to purchase SIBC preferred stock. At the same time, SIBC was building a building on this property that it no longer owned.

The second 1981 transaction was also a sale-lease back. It involved a property called the Morristown property. This transaction was similarly structured, and also resulted in a fraudulently inflated gain of $500,000 to SIBC, coupled with an excessive rent obligation.

The third transaction involved a development in West Virginia called Glade Springs. In this transaction, SIBC purchased $2 million in land contracts, without receiving title to the underlying real estate. The evidence reflects that this resulted in a substantial potential liability, but as far as the Court can determine, no real liability actually resulted. It was an extremely complex transaction, and no useful purpose would be served by reviewing it.

In any event, the 1981 Merchants Road and Morristown transactions appeared to give SIBC a $1 million profit, without which SIBC would have shown a 1981 year end loss, and without which SIBC would have been out of business. In fact, the 1981 audited financial statements of SIBC (Exhibit 27) showed these transactions resulting in profit. Ray Moody testified that this presentation was plainly improper under generally accepted accounting principles, because it was a sale-lease back to a related party. Moody also testified, as noted earlier, that with the proper presentation of these transactions, SIBC would have shown a loss and negative net worth in its 1981 year end financial statements.

Booker Camper, the CPA who prepared the 1981 financial statements, testified that

he showed the transactions as sales only because he was never made aware of the SIBC lease-backs.

In 1982, the State of Tennessee specifically questioned this aspect of the 1981 financial statement, as well as SIBC's high debt-equity ratio (Exhibit 29). Howard represented SIBC in responding to the State's concerns, and drafted or helped to draft a responsive letter signed by James Steiner, the president of SIBC (Exhibit 30). These letters establish that Howard was well aware of SIBC's financial difficulties in 1982.

Howard also attended meetings with the State Insurance Commissioner at which SIBC's financial condition was discussed in June and September of 1982. On September 7, 1982, Howard wrote a memo to Butcher regarding the status of the discussions, which further reflected Howard's knowledge of SIBC's financial condition (Exhibit 32). Moreover, Howard was continuing to receive regular monthly financial statements from SIBC.

The point of all of this is two fold. First, it firmly establishes that Howard was fully aware of SIBC's insolvency in late 1982 and early 1983. Second, it firmly establishes Howard's knowledge of, and indeed integral participation in, a series of transactions designed to create an illusion that SIBC was in better financial condition than it actually was. The 1979 and 1981 sale-lease back transactions were fraudulent and sham transactions designed to allow SIBC to maintain its public image by falsely strengthening its 1979 and 1981 financial statements. Howard and his firm were an integral part of these transactions.

The Court has found that SIBC's purchase of notes for $10.4 million in January of 1983 and its later redemption of the $8 million investment certificate were not in the ordinary course of SIBC's business, and that KMHF knew of SIBC's insolvency in January of 1983. These findings strongly suggest, and the Court further finds, that KMHF perceived or should have perceived the enormously adverse effect that these transactions would have on SIBC and its creditors.

(4)

Fourth, given KMHF's on-going attorney client relationship with SIBC from the 1970's through January of 1983, and its knowledge of the adverse effect that these transactions would have on SIBC and its creditors, it must be found that KMHF breached its ethical obligations to SIBC in doing essentially nothing to question, investigate or terminate the transactions.

On this issue, the Court heard from three experts, Mr. Willis, Mr. Cook, and Mr. Thomforde. Of the three, the Court found Mr. Cook's testimony the most credible and enlightening. Mr. Cook affirmatively and positively stated that KMHF had breached its fiduciary duties to SIBC both in regards to the numerous conflicts of interest and in regard to the firm's failure to act to protect SIBC. Indeed, Cook found the firm's conduct shocking. Willis agreed that the firm was subject to numerous conflicts of interest, and indicated that it should have withdrawn before it agreed to serve as escrow agent and, in any event, should have asked the Court for instructions regarding the disbursement of the investment certificate proceeds.

On the other hand, the Court was unpersuaded by Mr. Thomforde's view that KMHF owed no duties to SIBC in connection with the escrow transactions because SIBC was not a party, or, if it did, it could fulfill those duties by talking to Butcher. The problem with this approach, which Thomforde advocated as best reflecting the realities that attorneys actually face, is that it actually defies the reality that Butcher himself had a real conflict of interest as both chairman of the board of SIBC and as an individual pursuing the acquisition of two savings and loans with SIBC's money. Accordingly, the Court rejects Mr. Thomforde's conclusions regarding KMHF's breach of duties, and finds that KMHF did breach its professional obligations to SIBC in its service as the escrow agent.

(5)

Fifth, KMHF received none of SIBC's property in these transactions, nor did it benefit from the transaction directly.

### (6)

The sixth factor involves evaluating KMHF's intent in the transactions at issue. The Court concludes that KMHF acted with the same intent with respect to the escrow transactions at issue that it had with respect to the 1979 FSLC transaction and the 1981 Merchants Road and Morristown transactions. Just as those earlier transactions were designed to create an illusion that SIBC was financially sound when in fact it was not, the Court concludes that the escrow account was also designed to create an illusion—an illusion that Butcher in fact had $25 million in cash to fund the savings and loan acquisitions. In fact, he did not. Butcher and Crabtree emphasized in their testimony that Butcher needed to put the escrow funds right back into each of the financial institutions from which he had just pulled them, because they needed the funds to continue operations. The evidence further establishes that Butcher chose KMHF as escrow agent because he knew that Howard would invest the fund exactly where he directed, without question, and that Howard was perfectly willing to submit to that control.

Actually, the SIBC transactions perfectly illustrate this point. Butcher knew that SIBC could not survive unless it got back most of the $10.4 million he had just delivered to KMHF. To solve this problem, Butcher did two things. First, he arranged for the $4.6 million in participations on the C & C Plaza notes. Second, and more importantly for present purposes, he instructed his escrow agent and attorney, Howard, to purchase an $8 million investment certificate from SIBC, in order to put that cash back in. And Butcher and Crabtree testified similarly with respect to other financial institutions. (Transcript of April 10, 1989 at 93, 265, 276)

The point is that the $25 million escrow fund was only a paper fund, designed to create yet another illusion. Its purpose was to falsely enhance the likelihood that Butcher's attempt to acquire the two Florida savings and loans would be successful. And again, KMHF was an integral and willing part of that scheme and either knew or should have known what was happening.

Further evidence of this intent is found in the fact that the $500,000 SCIT note that SIBC purchased was not the only such worthless note sold to a financial institution. In fact, this note was only part of a $3.4 million package of such notes executed by Howard as trustee of SCIT at that time, all of which were sold to financial institutions.

And further evidence of this intent is found in the fact that on January 13, 1983, Howard, as trustee of SCIT, borrowed $610,000 from SIBC at Butcher's request, knowing that SCIT had no means of repayment.

Accordingly, the Court concludes that KMHF did not act with an honest and innocent intent in connection with the escrow account, but rather with the intent to deceive not only SIBC and its creditors but also the parties involved with the savings and loan acquisitions.

### F.

To a large extent, the defendants' good faith defense depends largely on the credibility of Howard's testimony that he was unaware that fraudulent transfers from SIBC had funded any of the escrow, unaware that Butcher needed to return the escrow funds to the institutions from which he had taken those funds, and unaware that SIBC was in any financial difficulty. The Court concludes that these denials, and Howard's testimony in general, lack credibility. The problem with these denials is that too many other denials in his testimony were proven false. For example, Howard testified unequivocally that he never discussed the financial condition of SIBC with anyone; but we know he discussed it at length in the discussions with the State of Tennessee in 1980 and 1982.

He testified that he was unaware of the transfer of funds into his client trust account on January 5, 1983, until months later. But he also testified that Gardner Daniel from the C & C Bank called him on January 5, 1983, to tell him the deposits were received. Moreover, Wendell Thom-

as, another attorney with KMHF, testified that on the day after the funds were deposited to the client trust account, he specifically discussed with Howard a concern that these funds ought to be in a separate escrow account. In fact, Howard agreed and then specifically arranged for that.

He denied attending the October 9, 1981, meeting at which the two sale-lease back transactions were discussed. But at his deposition he said he might have been there and his time statements reflect an SIBC entry on that day. That evidence, plus the fact that Howard then immediately began work on the new transactions, corroborates the testimony of Butcher and Crabtree that Howard did attend the October 9, 1981, meeting and the Court so finds.

Howard testified that he did not know what the $3.4 million in SCIT notes were worth. But at his deposition, he testified that they were worthless.

Howard denied drafting or assisting in the drafting of Exhibit 30, the letter of June 18, 1982, from Steiner to the State of Tennessee. It was only when he was shown his unequivocal time statements reflecting his work on that letter that Howard finally admitted it.

Howard characterized his work and the firm's work for SIBC as "transactional and infrequent." Without going into detail, the firm's time records (Exhibit 84) completely contradict that.

At trial, Howard flatly denied any discussion regarding Butcher's intention to sell the SCIT notes, but in his deposition he said that such discussions may have taken place, and Butcher testified that he discussed this matter directly with Howard at the time.

The only conclusion that can be drawn from this is that Howard's other denials, and his general attempt to minimize his involvement in these matters, simply cannot be accepted.

The Court recognizes that there are substantial problems with the credibility of Butcher and Crabtree, especially Crabtree, but generally the Court found their testimony worthy of belief because they ap-

peared to be testifying as candidly as possible in the circumstances. In contrast, the Court perceived that Howard was not. And since the defendants bear the burden of proof, they will have to bear the consequences of failing to meet that burden.

## VIII.

After considering all of these factors, the Court concludes that KMHF has not established its good faith in the transactions at issue, and that the defendants are therefore liable to plaintiff under sections 548(a) and 550 of the Bankruptcy Code in the amount of $5,814,000, and under sections 547(b) and 550 of the Bankruptcy Code in the amount $8,049,486.20.